**BROOKFIELD WIRE COMPANY, INC.,**
Petitioner, Appellant,

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent, Appellee.**

No. 81–1043.

United States Court of Appeals,
First Circuit.

Heard Sept. 11, 1981.

Decided Dec. 29, 1981.

D. Michael Kratchman, Detroit, Mich., with whom Edward M. Deron, and Evans & Luptak, Detroit, Mich., were on brief, for appellant.

Karl P. Fryzel, Atty., Tax Division, Dept. of Justice, Washington, D. C., with whom John F. Murray, Acting Asst. Atty. Gen., Michael L. Paup and Richard Farber, Attys., Tax Division, Dept. of Justice, Washington, D. C., were on brief, for appellee.

Before COFFIN, Chief Judge, ALDRICH, Senior Circuit Judge, and BREYER, Circuit Judge.

ALDRICH, Senior Circuit Judge.

Taxpayer Brookfield Wire Company's appeal from a decision in favor of the Commissioner of Internal Revenue, 49 T.C.M. (P–H) ¶ 80,321, presents a single question, whether the Tax Court was plainly wrong in finding that it accumulated earnings and profits beyond its reasonable business needs in the year 1973 for the purpose of avoiding taxation of its then sole stockholder. Int. Rev.Code of 1954 (26 U.S.C.) §§ 531–537.[1] We affirm.

■ Two tax years were initially involved. The court decided the first year, 1972, in taxpayer's favor, showing, in its detailed opinion, a full grasp of the facts and principles, and certainly no predilection to favor the commissioner. There are no subsidiary questions, and no special errors assigned. While taxpayer points to the court's analysis and conclusion for 1972 as indicative of inconsistency in 1973, we believe the shoe to be on the other foot. Under the plainly-wrong rule the presumption is to the contrary.

■ Taxpayer makes a further mistake. Although many basic facts were stipulated, this case was not tried on an agreed statement of facts, but, in important respects, on oral testimony. Taxpayer assumes the truth of all its evidence, particularly the testimony of one Richardson, who, at times, was its sole stockholder. Especially with regard to inferences and ultimate conclusions, the court was not obliged to accept whatever Richardson said, and it is clear that, at least on one occasion, it did not.

■ Finally, a matter we will develop later, taxpayer errs in assuming that if it accumulated income in order to make itself more attractive to a prospective purchaser, or because of a contract with such, this negatived the statutory bad intent. We do not equate the needs of the business with the stockholders' need to make their stock

1. § 531. *Imposition of accumulated earnings tax*

   In addition to other taxes imposed by this chapter, there is hereby imposed for each taxable year on the accumulated taxable income (as defined in section 535) of every corporation described in section 532, an accumulated earnings tax equal to the sum of—
   (1) 27½ percent of the accumulated taxable income not in excess of $100,000, plus
   (2) 38½ percent of the accumulated taxable income in excess of $100,000.
   § 532. *Corporations subject to accumulated earnings tax*

   (a) General rule.—The accumulated earnings tax imposed by section 531 shall apply to every corporation (other than those described in subsection (b)) formed or availed of for the purpose of avoiding the income tax with respect to its shareholders or the shareholders of any other corporation, by permitting earnings and profits to accumulate instead of being divided or distributed.
   § 533. *Evidence of purpose to avoid income tax*

   (a) Unreasonable accumulation determinative of purpose.—For purposes of section 532, the fact that the earnings and profits of a cor-

more attractive. The purpose of the statute is to look to the taxpayer's needs, not to those of its stockholders. Thus our question will be whether it must be found that taxpayer affirmatively determined, in December 1973, not to distribute 1973 income because of the felt needs of the business. We do not believe the court erred in finding otherwise.[2]

Taxpayer, with its office and factory in West Brookfield, Massachusetts, was engaged in the manufacture and processing of specialized wire products. Its market was steady. During the years 1951–1963 Richardson was its sole stockholder. What might be termed wheeling and dealing began in 1963, when he traded his Brookfield stock for 77,000 shares of Edgcomb Steel Co. common stock, while continuing to serve as Brookfield's president. In 1967 Richardson purchased a controlling interest in RSC Industries, Inc., the parent company of Brookfield's largest customer, and became president and chairman of its board of directors. In 1969 Edgcomb was acquired by The Williams Companies through a nontaxable merger. Richardson exchanged his Edgcomb stock for Williams preferred stock and stayed on as Brookfield's president. In June 1971, however, Edgcomb, feeling that Richardson was devoting insufficient time to the sale and marketing of Brookfield's products, notified him of its decision to replace him as president. Richardson responded by negotiating a deal with Williams whereby, in early 1972, he reacquired all of Brookfield's outstanding stock in exchange for some 50,000 shares of Williams preferred stock.

Having resumed his position as sole stockholder, Richardson investigated the possibility of expanding Brookfield's operations through the purchase of an existing plant in a southeastern state. After visiting several sites, he settled upon a facility in Allendale, South Carolina. The Allendale plant was twice as large as was needed, but Richardson knew that RSC, which he still controlled, was looking to expand one of its divisions. RSC subsequently orally agreed to lease half of the Allendale facility from Brookfield for its own expansion, and on April 3, 1973, Brookfield purchased the plant for $475,000. Brookfield proceeded to take some steps toward preparing Allendale for operations. It purchased machinery and equipment from an RSC subsidiary for $35,000, transported some dies from the West Brookfield plant to Allendale, and, in December, purchased some other dies from an Indiana distributor for $8,528. However, according to Richardson, there remained to be procured machinery which, if bought used, would cost on the order of $500,000.

Meanwhile, in August 1973, Richardson learned of an opportunity to purchase Howmet Corporation, a competitor of Brookfield, for $1,800,000. Whereas the Allendale expansion would be gradual, Richardson believed that acquiring Howmet would enable Brookfield to double its sales rapidly. Brookfield had $600,000 cash on hand. It obtained a commitment from its bank to finance the balance, and entered into serious discussions with Howmet, which advanced to the stage of refining a second draft of a proposed purchase agreement.

The sale never took place. Contemporaneous with the discussions with Howmet, another corporation, Handy & Harman, Inc., expressed an interest in merging with RSC and, in connection therewith, purchasing Brookfield for $3,050,000 cash. Handy & Harman had no interest in acquiring Howmet, however, and asked Richardson to terminate the Howmet negotiations. Squarely faced with this choice between a potential cash buyout and an excellent op-

---

2. poration are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid the income tax with respect to shareholders, unless the corporation by the preponderance of the evidence shall prove to the contrary.

2. Since the court supportably found that the evidence was not in equipoise, it is now irrelevant who should properly have borne the risk of nonpersuasion. This is not a case where the burden is determinative as matter of law. Cf. *Merrill Trust Co. v. Bradford*, 1 Cir., 1974, 507 F.2d 467, 471.

portunity for Brookfield to expand, Richardson chose the former, and on or about September 4, 1973, called off the Howmet deal.

In late September, a Handy & Harman subsidiary executed an agreement with Richardson which obligated it to purchase his Brookfield stock for $3,050,000 cash, but only if the proposed merger between RSC and Handy & Harman went through as planned. The agreement further provided, in effect, that until such time as the sale was consummated Brookfield was neither to pay dividends or make distributions to stockholders, nor to authorize any capital expenditures for addition to plant account in excess of $25,000. Pursuant to this provision, Brookfield terminated its expansion activity. Also as a consequence of the proposed Handy & Harman transactions, on October 30 Brookfield and RSC formalized in writing their oral lease agreement regarding the Allendale facility. The lease, in addition to providing for an annual rent of $80,000, contained put and take options, exercisable upon 45 days notice, empowering RSC to purchase the entire Allendale property at any time, or allowing Brookfield to require it to do so. In either event the sale price was to be fixed at Brookfield's tax basis.

On December 3, 1973, the proposed merger between RSC and Handy & Harman fell through, and consequently Handy & Harman's obligation to purchase Brookfield was nullified. On January 2, 1974, if not earlier,[3] a new party, Hoskins Manufacturing Company, contacted Richardson concerning the possibility of acquiring Brookfield. On January 3 Richardson responded by sending Hoskins confidential financial records. Hoskins personnel visited the West Brookfield plant, but not the Allendale facility. On March 4, RSC, still headed by Richardson, formally notified Brookfield of its decision to exercise its option to purchase the entire Allendale property. Finally, on April 5, Hoskins and Richardson executed an agreement providing for Hoskins' purchase from Richardson of two-thirds of the outstanding Brookfield stock at a price of $2,050,000. The agreement required Brookfield simultaneously to redeem the other one-third of its stock for $1,000,000 cash payable to Richardson. These transactions took place on April 22.[4] Some of the machinery and equipment that Brookfield had accumulated in Allendale was removed by Hoskins for use in West Brookfield and elsewhere. The rest was sold to RSC for use in Allendale.

This summary shows that Richardson was an operator, whose capital interests, at least at times, were far broader than the manufacture of wire products. The court, we might think generously, found that accumulated earnings of half a million dollars in December 1972 were justified because Richardson had a firm interest in increasing taxpayer's manufacturing potential by the acquisition of the Allendale facility. With regard to 1973, however, the court found that expansion had been placed on the back burner (a paraphrase of Richardson's own testimony, which taxpayer has been at pains to explain) and that taxpayer had accumulated $368,280 for the purpose of avoiding Richardson's payment of federal income taxes.

We agree with the court below that by December 1973, the plan to expand had become indefinite and secondary to Richardson's paramount interest in selling his stock and realizing a long term capital gain. Brookfield's actions speak for themselves. It passed up its best expansion opportunity—acquisition of Howmet—so that Richardson might pursue a sale to Handy &

---

**3.** In the extensive sworn submission to the Commissioner by taxpayer's attorney on December 12, 1975, it was represented that following December 3, 1973, "but prior to the close of 1973, Hoskins . . . proposed to Richardson to acquire Brookfield. . . ." At the trial the testimony was that Richardson was on vacation until January 2 and could not be reached.

**4.** Richardson received a certified check for $943,048.52 and the remaining $56,951.48 through the cancellation of a debt he owed Brookfield on a personal loan.

Harman. Then, after those negotiations began, it bound itself, from September 28 until December 3, 1973, not to spend any money on expansion. Finally, only one month later, Richardson entered into discussions with Hoskins which led to his sale of his Brookfield holdings and Brookfield's total abandonment of the Allendale plan.

As against this, Richardson testified that in December 1973 he renewed his thinking on behalf of Brookfield about expansion, and ordered the purchase for $8,528 of some dies which were shipped to Allendale. Considering that the projected equipment needs for Allendale totalled roughly half a million dollars, this minor purchase was scarcely a commitment; nor was there evidence that any difficulty in a resale was expected, or that any such difficulty in fact occurred. Rather, looking at the broader picture, the court could well conclude that because Brookfield's prospective purchasers uniformly lacked interest in pursuing the Allendale project, Richardson carefully avoided any commitment to Allendale which could not be revoked were he to receive an acceptable cash offer for his stock. The machinery and equipment earlier compiled in Allendale proved to be of a sort that could either be sold to RSC or other firms, or used in the West Brookfield plant, and no substantial steps were taken toward purchasing more expensive—and presumably less easily disposed of—necessary equipment, such as a rod-breakdown machine, which, if bought used, would cost over $150,000.[5] More important, in October 1973 taxpayer provided itself with an out from its previous substantial investment in Allendale by including in its lease with RSC a provision whereby Brookfield could force RSC to buy the entire property. The court was not obliged to accept taxpayer's argument that this provision was necessary to insure that RSC did not cease Allendale operations, leaving Brookfield with excess space and no tenant. All that was necessary for this purpose was an option to require RSC to purchase the area it leased,

roughly half the facility. The court could well find the option was a means by which taxpayer could deal from either the top or the bottom of the deck, so far as the matter of accumulations was concerned, leaving open the possibility of developing Allendale for expansion, but providing Brookfield with an easy way to withdraw from Allendale if Richardson found a buyer for his stock. In the same vein, by tying the option exercise price to its tax basis in the property, Brookfield put itself in a position to recover expenditures it made to improve or convert the physical plant, since these costs would be added to the property's tax basis, and correspondingly, to RSC's purchase price.

We agree, as did the Tax Court, that a small single-stockholder company may be found to have had adequate plans for the use of accumulated income to avoid the fall of the statute without any formal votes or commitments to paper. The purpose of the statute, however, is to require taxpayers, normally, to pay income taxes on income, rather than shift income into capital gains, at substantially lower rates. Here the short interval that elapsed between Handy & Harman's losing interest and Richardson's immediate response to Hoskins is further support for the court's accepting very literally his testimony that in December 1973 development of Allendale was "in the back of [his] mind." The court could properly find that Richardson, who was in full control of taxpayer, was actively interested in a sale, which would not include Allendale, and had no present plans to expand, and hoped he would never have to do so. The statute would have only hen's teeth if it were suspended every time the stockholders vigorously pursued plans to convert income into capital gains by a sale, so long as there were fall-back possible plans within the statutory exception. Obviously, this must be a question of degree. We are not persuaded that the court was unwarranted in concluding that any December 1973 expansion plans were so subordi-

---

5. At best, Richardson made some efforts to price this equipment, but the court disbelieved his testimony in this respect, as was its prerogative.

556

nate to Richardson's desire to sell his stock that they were no longer sufficiently definite to avoid the statutory penalty.

Nor is there merit in taxpayer's contention that even if it accumulated earnings beyond its reasonable business needs, the court erred in finding that it had failed to rebut the statutory presumption of an intent to avoid taxes to Richardson. Int.Rev. Code of 1954 (26 U.S.C.) § 533(a). Taxpayer points to three factors as showing a lack of such intent. The first, that taxpayer made frequent loans to Richardson which he always repaid, cuts the other way. *E.g., Herzog Miniature Lamp Works, Inc. v. Commissioner,* 2 Cir., 1973, 481 F.2d 857. Likewise, the second factor, taxpayer's dividend history, supports the commissioner's position. While taxpayer was publicly owned it regularly paid large dividends; during the years it was owned by Richardson, it never paid any dividends. The inference to be drawn is obvious, and taxpayer offered no evidence that would rebut it. Finally, the court could properly find of little consequence the fact that when Richardson resumed control of Brookfield in 1972, he increased his salary, as well as the rental fee he charged the corporation for use of his airplane, since this additional income merely offset his concomitant loss of Williams dividend income.

Taxpayer asserts that Richardson "was a businessman whose actions were motivated by business and not tax considerations." The court was warranted in finding that the facts strongly indicated otherwise.

*Affirmed.*