JOSEPH F. ACETO, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Aceto v. Commissioner
Docket No. 3968-88
United States Tax Court
T.C. Memo 1990-486; 1990 Tax Ct. Memo LEXIS 534; 60 T.C.M. (CCH) 717; T.C.M. (RIA) 90486; September 11, 1990, Filed *534 Decision will be entered under Rule 155. Joseph F. Aceto, pro se. Linda S. Bednarz, for the respondent. WELLS, Judge. WELLS
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined the following deficiencies in and additions to petitioner's Federal income tax: Taxable
[1] Additions to Tax Under Sections Year
Deficiency
6661
6653(b)(1)
6653(b)(2)
1981
$ 75,653.32  0 $ 37,826.66 0
1982
411,718.55  $ 102,929.64
205,859.28
*
*535 FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and attached exhibits are incorporated herein by reference. Petitioner resided in Cinnaminson, New Jersey, when he filed the petition in the instant case. After concessions, [2] we must decide the following issues: (1) whether petitioner failed to report illegal income from the manufacture and sale of phenyl-2-propanone (P2P) during the years in issue; (2) whether petitioner is liable for the addition to tax for substantial understatement of income tax; and (3) whether petitioner's medical expense and sales tax deductions should be adjusted to reflect an increase in adjusted gross income. During the years 1981 and 1982, petitioner was employed as a sales representative by Chapman Industrial Finishes, Inc. (Chapman). In 1981, petitioner approached Wilbur Rupert about setting up a business involving the manufacture *536 and sale of P2P, a "controlled substance" under Federal narcotics laws. Wilbur Rupert recently had lost a substantial amount of money in a business venture and was not employed. Petitioner minored in chemistry in college and worked for many years for Chapman and therefore had the technical expertise to manufacture P2P. Wilbur Rupert agreed to set up a laboratory to manufacture P2P in his basement and agreed to run the laboratory. Petitioner paid Wilbur Rupert approximately $ 50,000 for his services during 1982. Wilbur Rupert had no background in chemistry. Petitioner personally purchased 800 pounds of phenyl acetic acid from the Givaudan Corporation in 1981 and 1982. Phenyl acetic acid is the primary raw material used in the manufacture of P2P. Petitioner had access to phenyl acetic acid through his employment with Chapman. Petitioner placed the orders for phenyl acetic acid in the name of Chapman, but used his personal address on the purchase orders. Chapman had nothing to do with the purchases of phenyl acetic acid and did not use phenyl acetic acid in its business. After receiving each order of phenyl acetic acid from Givaudan Corporation, petitioner delivered the phenyl *537 acetic acid to Wilbur Rupert's home. The laboratory consisted of five or six systems which each produced P2P. Each system was run at least six and sometimes seven days a week. Once the P2P was manufactured, Wilbur Rupert delivered it to petitioner, who sold the P2P. Wilbur Rupert never sold the P2P. On November 22, 1982, agents of the Drug Enforcement Administration (DEA) conducted a surveillance of petitioner. They followed petitioner from the Givaudan Corporation, where he picked up an order of 200 pounds of phenyl acetic acid, to Wilbur Rupert's residence, where the phenyl acetic acid was placed in the garage. Both petitioner and Wilbur Rupert subsequently were arrested. The laboratory run by petitioner and Wilbur Rupert was one of the largest P2P laboratories that Victor Pedalino, a DEA agent who testified as an expert at trial, had seen in the state of New Jersey. On November 23, 1982, while being questioned by DEA agents, petitioner told the agents that he and Wilbur Rupert were using the phenyl acetic acid in experimenting for the removal of oil sludge. Subsequent to his arrest, petitioner also told DEA agents that he and Wilbur Rupert were using the phenyl acetic *538 acid to make floor wax. Petitioner claimed at trial that he used some or all of the phenyl acetic acid he purchased from Givaudan Corporation to correct problems with paint he had sold to Wickerware II, a customer of Chapman. Prior to the time of their arrest, petitioner and Wilbur Rupert discussed alibis they would use if their illegal drug business was discovered. Petitioner told Wilbur Rupert that he would say that he was using the phenyl acetic acid to improve the paint he sold. Because phenyl acetic acid emits a strong odor, it could not be used in paint. On January 14, 1983, petitioner was charged, by information, in the United States District Court for the District of New Jersey, Criminal No. 83-07 as follows: That from on or about October 29, 1981 continuing through on or about November 22, 1982 at Cinnaminson, in the District of New Jersey the defendant, JOSEPH F. ACETO, knowingly and wilfully did combine, conspire, confederate, and agree with others to knowingly and intentionally manufacture a quantity of Benzyl Methyl Ketone (P2P), a schedule II controlled substance * * * In violation of Title 21, United States Code, Section 846. Petitioner *539 was represented by counsel and entered a guilty plea to such charge on January 14, 1983. Petitioner's guilty plea was accepted, and petitioner was sentenced to two years imprisonment and fined $ 1,000.00. Petitioner kept no books and records concerning his purchases of phenyl acetic acid or the manufacture and sale of P2P. Thirty-five gallons of P2P can be produced from six hundred pounds of phenyl acetic acid. During 1982, the laboratory run by petitioner and Wilbur Rupert produced 35 gallons of P2P. The street price of P2P in the Philadelphia and Cinnaminson, New Jersey, areas during 1981 and 1982 was at least $ 10,000.00 per gallon. Four gallons of P2P, manufactured but not yet sold, were found in the laboratory at the time of petitioner's arrest. Two hundred pounds of raw phenyl acetic acid were seized by the DEA during such arrest. OPINION Respondent's determination in the instant case is based on unreported illegal income. In cases involving unreported illegal income, the Commissioner generally has the burden of going forward with "substantive evidence" linking the taxpayer to the illegal, income-producing activity. Llorente v. Commissioner, 649 F.2d 152, 156 (2d Cir. 1981), *540 affg. in part and revg. and remanding in part 74 T.C. 260 (1980); Petzoldt v. Commissioner, 92 T.C. 661, 688 (1989); Berkery v. Commissioner, 91 T.C. 179, 195 (1988), affd. without published opinion 872 F.2d 411 (3d Cir. 1989).Absent such evidence, the notice of deficiency is not entitled to its usual presumption of correctness. In the instant case, we need not decide whether the notice of deficiency is presumed correct with respect to either of the taxable years in issue. With respect to the taxable year 1981, even assuming that respondent's notice is presumptively correct, the testimony of respondent's own witness defeats a finding of unreported illegal income in such year. Wilbur Rupert testified that "we didn't produce anything of any saleable quality in 1981. It was basically in '82 where there was saleable, and by my best estimate it was 30 to 32 gallons." Even though Wilbur Rupert is a convicted felon, we observed his demeanor on the witness stand and found him to be a credible witness. We believe his testimony to be truthful. With respect to the taxable year 1982, we find the evidence of petitioner's receipt *541 of unreported illegal income sufficient to establish the existence of a deficiency as found below without resort to the burden of proof; our conclusion as to 1982 would be the same even absent any presumption in favor of respondent. See Brookfield Wire Co., Inc. v. Commissioner, 667 F.2d 551, 553 n.2 (1st Cir. 1981), affg. T.C. Memo. 1980-321; Deskins v. Commissioner, 87 T.C. 305, 322-323 n.17 (1986). Respondent has offered overwhelming evidence of petitioner's activity involving the manufacture of P2P in 1981 and 1982 and the sale of P2P in 1982. In addition to the testimony of Wilbur Rupert, the evidence of petitioner's involvement with P2P includes the testimony of Victor Pedalino, a DEA agent, who testified about the investigation of petitioner; Jack Travers, an officer of Givaudan Corporation, who testified about the amount of phenyl acetic acid purchased by petitioner during 1981 and 1982; and John Chapman, President of Chapman, who testified that petitioner purchased phenyl acetic acid during 1981 and 1982 without the knowledge or authority of Chapman. Petitioner's guilty plea also establishes that he conspired with Wilbur *542 Rupert to manufacture P2P during 1981 and 1982. Meier v. Commissioner, 91 T.C. 273 (1988).The evidence adduced by respondent is uncontradicted by any credible evidence offered by petitioner. Petitioner generally denies respondent's allegations and asserts that some or all of the phenyl acetic acid was ordered by Chapman rather than by petitioner, personally. Petitioner also asserts that he used phenyl acetic acid to correct problems in paint sold to a major customer of Chapman. For several reasons, we reject petitioner's assertions. First, regarding the assertion that his employer ordered the phenyl acetic acid, John Chapman, President of Chapman, testified that Chapman never sold phenyl acetic acid to its customers and that it did not use phenyl acetic acid in its business. Jack Travers, President of Givaudan, the source from which petitioner purchased the phenyl acetic acid, testified that all of the orders were placed by petitioner personally. The orders showed petitioner's home address rather than Chapman's address. Six of the seven orders of phenyl acetic acid were picked up by petitioner personally and paid for by certified check or money order. The *543 evidence is overwhelming that petitioner purchased the phenyl acetic acid personally. Regarding petitioner's assertion that the phenyl acetic acid was used to correct problems in paint sold to a customer of Chapman, we find such an assertion to be inconsistent with petitioner's guilty plea. Moreover, respondent's expert testified that phenyl acetic acid would never be used in paint because of its strong odor. We also lack confidence in petitioner's self-serving testimony, which we are not bound to accept as truthful. Tokarski v. Commissioner, 87 T.C. 74, 77 (1986). After his arrest, petitioner made various inconsistent statements about his use of the phenyl acetic acid. Upon questioning by DEA agents, petitioner told them that he was using the phenyl acetic acid to develop a formula for floor wax. Later, petitioner claimed that he was using phenyl acetic acid to develop a formula for sludge removal. At trial, petitioner offered yet another version, i.e., that the phenyl acetic acid was to be used to correct problems in paint sold to a customer. Petitioner did not offer any evidence to corroborate his assertion that he actually used 600 pounds of phenyl acetic *544 acid in the correction of customer paint problems. We observed petitioner's demeanor at trial and we find that he was not credible. We therefore do not believe that the explanation offered by petitioner at trial is true. The Revenue Agent who made the computations contained in the notice of deficiency died prior to trial. The notice of deficiency was based upon the premise that 101 gallons of P2P could be produced from the 800 pounds of phenyl acetic acid purchased by petitioner. At trial, however, respondent's agent, Mark Gerwald, testified that the deficiency should be reduced to $ 39,187 in 1981 and $ 262,818 in 1982 to reflect the evidence that petitioner and Wilbur Rupert only produced 35 gallons of P2P during the years at issue. The 35 gallon figure is based upon 600 rather than 800 pounds of raw phenyl acetic acid, because 200 pounds were seized during the arrest of petitioner and Wilbur Rupert by the DEA. The 35 gallon figure is also based upon the opinion of respondent's expert adduced at trial as to the amount of P2P that could be produced from 600 pounds of phenyl acetic acid. Respondent's new computations also decreased the 35 gallon figure to 31 gallons to reflect *545 the 4 gallons seized by the DEA during the arrest. Respondent's agent allocated one-eighth of the income to 1981 and seven-eighths to 1982 based upon the dates of purchases of the phenyl acetic acid by petitioner. Based upon Wilbur Rupert's testimony, however, that no P2P was sold until 1982, we find such an allocation inconsistent with the evidence. We find that all of the thirty-one gallons of P2P were sold during 1982 and accordingly that all of the income from such sales should be allocated to 1982. Respondent also concedes on brief that $ 50,000 was paid to Wilbur Rupert. We therefore give credit for such payment. We also give credit, as conceded by respondent, for the $ 4,730 cost of the phenyl acetic acid purchased by petitioner and the $ 5,800 in illegal drug income reported by petitioner on his 1982 return. As noted above, petitioner failed to keep any books and records concerning his purchases of phenyl acetic acid or his manufacture and sale of P2P. Respondent may use any reasonable means to compute unreported income, especially where, as here, the taxpayer has failed to keep adequate records and the unreported income is derived from an illegal enterprise. See *546 Petzoldt v Commissioner, 92 T.C. 661, 692-694 (1989); Graff v. Commissioner, T.C. Memo. 1986-550. Based upon the foregoing, the Court will order that the decision in the instant case reflect zero deficiency in 1981 and that the deficiency for 1982 be calculated under the Rule 155 computation hereinafter ordered on the basis of $ 249,470 of additional unreported income. [3]
No argument is made by petitioner regarding the section 6661 addition. On his 1982 return, petitioner merely attached a Schedule C showing $ 5,800 of other income from "commissions," and listing "MFR'S SALES REP." as the main business activity and "CHEMICALS" as the product. Because petitioner did not disclose adequately [4] the relevant facts relating to the illegal manufacture and *547 sale of P2P on his return and because there is or was no substantial authority for his position, section 6661 applies for taxable year 1982. The adjustments to the medical expense and sales tax deductions flow from the increased adjusted gross income for 1982. To reflect the foregoing, Decision will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code of 1954 as in effect for the taxable years in issue.↩
*. 50 percent of the interest due on $ 411,718.55.↩
2. At trial, respondent conceded the fraud additions and sought a reduced deficiency, discussed hereinafter.↩
3. Thirty-one gallons of P2P sold X $ 10,000 per gallon sale price, or a total of $ 310,000 from sales income, less $ 5,800 previously reported, $ 4,730 cost of phenyl acetic acid purchased and $ 50,000 paid to Wilbur Rupert.↩
4. See Schirmer v. Commissioner, 89 T.C. 277, 284-286↩ (1987).