# United States Court of Appeals

## For the First Circuit

No. 02-1761

HAFFNER'S SERVICE STATIONS, INC.,

Petitioner, Appellant,

v.

COMMISSIONER OF INTERNAL REVENUE,

Respondent, Appellee.

APPEAL FROM A DECISION OF THE UNITED STATES TAX COURT

[Hon. David Laro, U.S. Tax Court Judge]

Before

Boudin, Chief Judge,

Torruella and Lipez, Circuit Judges.

Kenneth A. Cohen, P.C. with whom Don M. Kennedy, P.C., Jeffrey Alan Simes, Collin O'Connor Udell and Goodwin Procter LLP were on brief for petitioner.
Andrea R. Tebbets, Tax Division, Department of Justice, with whom Richard Farber, Tax Division, Department of Justice, and Eileen J. O'Connor, Assistant Attorney General, were on brief for respondent.

March 31, 2003

BOUDIN, **Chief Judge**.  The Commissioner of Internal Revenue (the "Commissioner" or "IRS") assessed deficiencies against the taxpayer Haffner's Service Stations, Inc. ("the company" or the "taxpayer") for the three subject years (1990-1992), disallowing the deduction of certain bonuses and imposing the accumulated earnings tax.  26 U.S.C. §§ 162, 531-37 (2000).  The Tax Court agreed with the Commissioner, Haffner's Serv. Stations, Inc. v. Comm'r, 83 T.C.M. (CCH) 1211 (2002), and the company has now appealed to this court.  26 U.S. § 7482 (2000).

The background facts are undisputed.  The taxpayer is a close corporation that sells oil and gas in Massachusetts and New Hampshire through its own service stations and by delivery.  Throughout the tax years in question, Louise Haffner held all of the voting shares of the company, and together with her husband Emile Fournier a significant minority of the nonvoting shares.  The remaining nonvoting shares were held by their children, and by two trusts of which Louise was the trustee (Emile was co-trustee of one) and their children the beneficiaries.

In 1989, two of Louise and Emile's five children (Susan and Richard) filed suit against them in state court, alleging breach of fiduciary duty arising from a 1961 transfer of voting shares from one of the trusts to Louise.  In July 1990, Louise and Emile offered to settle Richard's suit for $650,000, including a redemption of Richard's shares in the corporation.  Richard countered that his

-2-

shares were worth at least $16 million, and no settlement occurred. In 1995, a third child (Joline) joined the suit. In 1996, a state court ruled that a breach had occurred, and that the transfer of shares had to be rescinded and an independent trustee appointed. After the rescission, Louise still held about 84 percent of all voting shares. Haffner's, 83 T.C.M. (CCH) at 1214.

During each subject year, Louise, Emile and their sons Haff and Richard, were employees of the company; Louise, Emile and Haff also constituted the board of directors. Haff was the president of the company and made most major business decisions. For the three subject years, Haff received compensation of approximately $742,400 (including a bonus of $625,000), $592,000, and $469,250, respectively. Richard was the vice president of the company, responsible for monitoring station condition and collecting money from three of the stations. His compensation was approximately $50,000 in each subject year. Haffner's, 83 T.C.M. (CCH) at 1215.

Louise was the treasurer of the company, and Emile the assistant treasurer and secretary. Louise and Emile performed various office duties, such as answering the telephone and signing checks; but they also discussed many of the business decisions with Haff. Their salaries were never higher than $20,000 per year and there is no evidence that they received substantial bonuses in prior years. For the subject years, Louise and Emile received identical

-3-

bonuses of $625,000, $475,000, and $250,000. The company allocated $100,000 from each of their 1990-91 bonuses to a related corporate entity, and deducted the rest on its tax return. The IRS disallowed the company's deductions as unreasonable. Haffner's, 83 T.C.M. (CCH) at 1215-16.

The company has never paid a dividend. In 1989, its accountant recommended a build-up in reserves in contemplation of a share redemption in connection with the family litigation. At the end of 1989, the company's unappropriated retained earnings were roughly $4.9 million; this figure rose to $6.3 million, $7.2 million, and $7.9 million, respectively, at the end of each subject year. In 1996, the IRS notified the taxpayer that it would impose the accumulated earnings tax on the increase in retained earnings for the three years in question. See 26 U.S.C. § 535(a). The company argued in the Tax Court that the accumulation was reasonable for various business purposes, including the redemption of the shares of dissenting shareholders.

The Tax Court rendered a detailed opinion, sustaining the Commissioner's deficiency assessments but striking down the Commissioner's imposition of penalties. Haffner's, 83 T.C.M. (CCH) at 1212. The taxpayer has now appealed to challenge both the disallowance of the bonuses and the imposition of the accumulated earnings tax. We review questions of law de novo but fact findings of the Tax Court only for clear error. 26 U.S.C. § 7482(a)(1); Fed.

R. Civ. P. 52; MedChem (P.R.), Inc. v. Comm'r, 295 F.3d 118, 122 (1st Cir. 2002). Clear error exists if, on the entire record, the court is "left with the definite and firm conviction that a mistake has been made." Mitchell v. United States, 141 F.3d 8, 17 (1st Cir. 1998).

Compensation. Under current law, both dividends and wages are treated as ordinary income to the recipient and taxed at the same rate. But for the corporation that makes the payments, wages are deductible while dividends are not. In close corporations, there is an obvious incentive to disguise dividend distributions as compensation expenses. See 26 C.F.R. § 1.162-7(b)(3) (2002). The opportunity exists because leading shareholders are also often managers of the company, and the benefit is obvious: by reducing corporate taxes, more accrues to the shareholders. See generally, e.g., 7 Mertens Law of Federal Income Taxation §§ 25E:04, 25E:29 (1996) ("Mertens").

The Internal Revenue Code limits deductibility to "reasonable" compensation, 26 U.S.C. § 162(a)(1), which serves in part as a safeguard against conversion of dividends into salary. Treasury regulations--which are binding on us unless inconsistent with the statute, see Boeing Co. v. United States, No. 01-1209, slip op. at 9-10 (U.S. March 4, 2003)--require reasonableness to be based on "all circumstances." 26 C.F.R. § 1.162-7(b)(1) (2002). What

subsidiary factors are considered in this test of reasonableness is apparently a question of first impression in this circuit.

Other circuits and the Tax Court have employed multi-factor tests, the factors ranging from a handful to almost two dozen in various formulations. See Bittker & Lokken, Federal Taxation of Income, Estate and Gifts ¶ 22.2.2 (3d ed. 1999) (collecting cases and discussing factors); 7 Mertens, § 25E:11-29 (same). By and large, longer lists include elements that, in shorter ones, are grouped together. The Second Circuit offers a typical example of a short collection: the employee's role, payments by comparable companies, nature and condition of the company (e.g., earnings), incentives to distort, and consistency of compensation within the company. Dexsil Corp. v. Comm'r, 147 F.3d 96, 100 (2d Cir. 1998).

The Seventh Circuit, in Exacto Spring Corp. v. Commissioner, 196 F.3d 833 (7th Cir. 1999), has vividly criticized the existing multi-factor tests as unpredictable. Id. at 835. The company reads the decision as laying down a single-factor test which asks whether "an independent investor" would approve the disputed compensation as a reasonable reward for the manager's performance. It asks us to adopt the test for this circuit. But in Exacto Judge Posner conceded that the independent investor test was not an exclusive answer to the problem, id. at 839, and Exacto's emphasis

on the company's profits reflected in part the character of that case.[1]

There is always a balance to be struck between simplifying doctrine and accuracy of result, and for the present we think that multiple factors often may be relevant. Exacto remains a useful reminder that reasonableness under section 162(a)(1) is not a moral concern or a matter of fairness; the inquiry aims at what an arm's-length owner would pay an employee for his work. The problem is that the actual payment--ordinarily a good expression of market value in a competitive economy--does not decisively answer this question where the employee controls the company and can benefit by re-labeling as compensation what would otherwise accrue to him as dividends.

Turning to the principal pertinent factors, the one nominally most helpful to the taxpayer here is its general performance and, in particular, the return on equity ("ROE"), which averaged 24.6 percent during the period 1977-92 as compared with 17.4 percent for peer companies. The Tax Court said that the data underlying the comparison were unreliable, Haffner's, 83 T.C.M. (CCH) at 1218-19; and as support the IRS notes that the average pertained to the 16-year period rather than the subject years and

_____

[1]The compensation at issue in Exacto was that of the chief executive, presumptively due the primary credit for any successes, 196 F.3d at 839, and all the traditional factors favored the taxpayer or were neutral, id. at 836-37.

that the ROE and net income both declined substantially during the subject years.

Certainly the ROE for the longer period looks impressive and other factors (growth in revenues and profits) show an upward curve over that period. But the decline in ROE and net income during the subject years, accompanied by a spike in bonuses, does raise substantial questions as to whether the increase was for performance, whether the performance merited the compensation, and whether, in any case, any successful performance can be properly attributed to Louise and Emile.

Comparability of compensation is another common gauge, see 26 C.F.R. § 1.162-7(b)(3), operating in two quite different dimensions. One is with pay for similar jobs at like companies; the other is a comparison with others within the same company, especially non-owner employees, making the appropriate adjustment for differing responsibilities. Here, the Tax Court found that the comparability evidence either affirmatively undercut or did not support the company's position. Haffner's, 83 T.C.M. (CCH) at 1224. In the end, the issue depends in part on what roles Louise and Emile played.

As to horizontal comparison across companies, the taxpayer's expert said that Louise and Emile's compensation for the subject years was about 7-8 percent of gross income (20-23 percent of net) and within the range for peer companies. The Tax Court

criticized this assessment on several grounds (e.g., that the comparison grouped the top three executives together and that publicly traded companies were not comparable) and found the numbers still too high. Haffner's, 83 T.C.M. (CCH) at 1220, 1222. The IRS argues as well that a comparison with peer companies based on similar job titles means little where, as here, Louise and Emile did not (in the Commissioner's view) perform meaningful roles.

As to comparability within the company, the data at best do not help the taxpayer and at worst hurt its position. Haff himself received handsome bonuses, but he was the CEO and his responsibility is undisputed. No one else in the company received significant bonuses and, as the IRS points out, Louise and Emile's bonuses in 1990 were each 12.5 times the salary of the next highest paid employee. Of course, if Louise and Emile were the strategic brains of the company, the differential can be explained; but it turns out that they were not.

This brings us to their roles in the company. The taxpayer showed that they were devoted to the business and worked long hours, but there was little concrete evidence that their roles during the years in question were very important. Many of their functions were mundane (e.g., answering the telephone); and relabeling the signing of checks as "responsible for . . . banking relationships," as the taxpayer did here, is poor stuff. Neither Haff, who testified that he consulted with his parents regularly,

nor other employees could give specific examples of policy decisions that Louise and Emile made during the subject years.

The Tax Court's view that Louise and Emile did not play major executive roles is not clearly erroneous and this conclusion undermines the support for very high bonuses. Even if the company performed well in the subject period and even if executives at comparable companies got large packages--both disputable premises--a neutral owner would not pay Louise and Emile handsomely for producing results for which others, or merely good economic times, were responsible.

The company argues that present compensation can legitimately reward past underpayment, and we do not mechanically exclude this possibility. See, e.g., Bittker & Lokken, ¶ 22.2.2, at 22-24 & n.22. But such make-ups can be more convincingly defended as market-based where performance is improving and retention of a key executive a matter of forward-looking concern. Here, performance was not improving; evidence of past executive contributions was sparse; and there was almost nothing to show that Louise and Emile were vital cogs in the subject years or likely to be so in the future.

In the end, we agree with the Tax Court that the bonuses deducted by the company were unsupported; the IRS has not challenged the portion of the bonuses allocated to an affiliated company but, as the affiliate is a subchapter S corporation, deductibility is not

an issue. Perhaps a more modest bonus from the taxpayer would not have been challenged or could have been more easily defended, but the taxpayer has staked its position on defending the bonuses actually paid and we have no basis for substituting a smaller figure for which it has not argued.

Accumulated Earnings Tax. Section 531 of the Internal Revenue Code imposes an accumulated earnings tax on a corporation "availed of for the purpose of avoiding" the personal income tax on shareholders by accumulating rather than distributing earnings. Although this language is couched in terms of purpose, the statute goes on to provide that an accumulation beyond the reasonable needs of the business is ordinarily "determinative of the purpose to avoid" tax. 26 U.S.C. § 533(a); United States v. Donruss Co., 393 U.S. 297, 307 (1969). In this case, as in most section 531 cases, the touchstone is reasonableness.

In the Tax Court, the company offered several potentially legitimate business reasons for this accumulation, among them to resolve family litigation, to counter competition from better financed and more established companies, to finance necessary supplies of oil and gas, and to pay for regulatory compliance. The Tax Court rejected the first ground on the merits and the others as contrived after-thought justifications. We start with the family litigation ground initially advanced by the taxpayer and then return to the others.

-11-

In 1989, the same year that Richard and Susan began their law suit, the company accountant told the company that a redemption of their stock was a plausible solution and that the company should "start building up the reserves." One figure demanded by Richard was $16 million, although the company thought at the time that this was wildly inflated. The company asserted in the Tax Court that it needed a reserve of $10 million to protect against litigation costs and the potential cost of redemption--admittedly, this amount exceeds its full retained earnings including the three-year accumulation contested by the IRS.

Although this might at first appear a promising argument for accumulation, the Tax Court rejected the claim root and branch: it held that the accumulation was not in fact based on the asserted purpose, that there was no specific plan to use the funds for redemption, and that in this instance such a redemption was not connected to the taxpayer's interests, however much it might have helped Louise and Emile. Haffner's, 83 T.C.M. (CCH) at 1225-26. It buttressed these conclusions with a considerable discussion of the evidence.

On appeal, the company complains of Tax Court error, first, in allegedly requiring that the stock redemption be "necessary" for the company's survival rather than merely reasonably connected with a business purpose, and, second, in supposedly demanding that the plan of accumulation be a formal one, e.g., one

-12-

committed to paper. It is not clear that the Tax Court adopted either a "necessity" test,[2] see Haffner's, 83 T.C.M. (CCH) at 1226, or a formal plan requirement,[3] but we need not pursue these issues because at least a "specific plan" was required to justify the accumulation, and none was present here.

The statute makes no reference to specific plans, formal or otherwise, but the Treasury has adopted regulations implementing the "reasonable needs" provision which include the following language:

> In order for a corporation to justify an accumulation of earnings and profits for reasonably anticipated future needs, . . . the corporation must have specific, definite, and feasible plans for the use of such accumulation.

26 C.F.R. § 1.537-1(b)(1) (2002). The company does not challenge the regulation as unauthorized or as inconsistent with the statute. See 26 U.S.C. § 7805.

The regulation is fatal to the company's position. Dispensing with formality does not create a license for vague,

---

[2]A strict requirement that the redemption be "necessary" for corporate survival would be legal error; the law only requires that the redemption be "directly connected with the needs of the (2002); see also Mountain State Steel Foundries, Inc. v. Comm'r, 284 F.2d 737, 745 (4th Cir. 1960); 10 Mertens, § 39.120, at 172.

[3]There is no requirement that the plan be formal; indeed, the accumulated earnings tax is almost always directed at close corporations which are likely to be less formal in their record-keeping. See Brookfield Wire Co. v. Comm'r, 667 F.2d 551, 555 (1st Cir. 1981). But the lack of a paper record is still evidence as to whether any plan existed.

-13-

uncertain or indefinite plans. Brookfield, 667 F.2d at 555-56; 26 C.F.R. § 1.537-1(b)(1). Beyond the accountant's initial recommendation, the Tax Court found virtually nothing in the record to support a plan of accumulation for redemption: according to the Tax Court, there were no written projections, no board resolution, no evidence even of a board discussion of the matter, let alone any careful study of amounts or likely need.

The company makes no effort to counter these factual findings, and these findings make it impossible to describe the Tax Court's ultimate conclusion--that no specific plan existed--as clear error or unreasonable (one could argue for either standard but the outcome would not be affected). The Tax Court did not adopt any per se rule that the absence of some single element (such as writing or projections) would be fatal under the specificity requirement; it simply found that under all the circumstances no specific plan existed in this case. It thus does not matter whether a plan if it existed could have been justified.

The plan requirement is worth bearing in mind as we turn to the other reasons offered on appeal--in fact, the taxpayer puts them ahead of the redemption claim in its brief--to justify the accumulation: competition, environmental regulations, securing supply. As a first claim of error, the company argues that the Tax Court improperly refused to consider most of this evidence, and instead limited the taxpayer to the single rationale of family

litigation (already discussed), because the taxpayer did not present its other justifications until the case came to court. It says that had these justifications been considered, the evidence would have supported the accumulation.

After some prior discussions between the company and the IRS with respect to the accumulated earnings tax, the IRS notified the company in November 1996 that a deficiency notice was about to issue, and invited the company to respond. The company answered in December 1996, and mentioned only family litigation as a reason for the accumulation. This remained for some time the sole justification claimed by the company; it did not assert the other business reasons until, at the earliest, sometime in late 1999, roughly three years after the IRS notification.

The company suggests that the Tax Court took the late proffer of these other business reasons as precluding their assertion at trial. This, if true, would have been legal error: the omission of the other business reasons from the December 1996 response merely left the burden of proof with respect to these reasons with the taxpayer. 26 U.S.C. § 534(a). But this is not what occurred. Rather, the taxpayer's argument is an imaginative attempt to convert an evidentiary decision into a statutory error.

In its decision, the Tax Court did say that it would "focus solely" on the family litigation explanation for the accumulated earnings, and this in part resulted from the company's

late proffer of the other business reasons. Haffner's, 83 T.C.M. (CCH) at 1225. But at trial the Tax Court did not exclude evidence of the other business reasons, nor did it fail to consider them in its decision; instead, it found these reasons to be "an after the fact rationalization" not worthy of acceptance. Id. It was this factual finding--not any misreading of section 534--that doomed the alternative justifications. Thus, the Tax Court said:

> Petitioner asserts in brief that it also accumulated earnings during the subject years for reasons other than a stock redemption. Neither the petitioner's December 16, 1996, letter nor its pleadings in this case set forth any reason for the earnings accumulation other than a stock redemption. Nor did petitioner's authorized representative state any other reason when, during petitioner's audit, he responded to the IDR. In fact, the first time that petitioner asserted that it was also accumulating earnings to meet certain business contingencies and to provide working capital was at or about the time of trial. Such an after the fact rationalization to support the accumulation of earnings is unavailing.

Id. (footnote omitted).

We accept as correct, or at least not clearly erroneous, the Tax Court's finding that these late-proffered reasons were not the actual, subjective motives for the accumulation. The company does not explicitly contest this finding on appeal; the fragments of evidence it cites on this issue are so vague and qualified as to underscore, rather than undermine, the Tax Court's own finding. Principally, its brief on appeal simply proceeds from the proposition that section 534 does not prevent the taxpayer from

-16-

objectively justifying the accumulation on competition, supply and government regulation grounds. This in turn poses a question of some interest: whether the reasons proffered to justify the accumulation need to have been the actual reasons that in fact motivated the taxpayer's accumulation.

If one looked solely at statutory language, it might be plausible to argue that, in the absence of conclusive proof of the forbidden "purpose to avoid" (a purpose which is alone fatal under section 531(a)), an after-the-fact justification that is objectively reasonable would suffice. One could also argue that it would be unfair or unreasonable to penalize a taxpayer who lacked an avoidance purpose for having accumulated an otherwise legal amount of earnings for the wrong reasons. The form of the company's argument implicitly assumes that this is the law.

We need not pursue this issue because the "specific plan" requirement in the regulations is again fatal to the taxpayer: on a sensible reading, one cannot have a "specific. . . plan[ ]" to accumulate "for" a reasonable business need unless that need is an actual reason for the accumulation. Other language in the regulation underscores the requirement that the reasonable needs must be recognized at the time of the accumulation.[4] This

_____

[4]See, e.g., 26 C.F.R. § 1.537-1(b)(2) (2002) ("[S]ubsequent events may be considered to determine whether taxpayer actually intended to consummate" plan of accumulation.); see also, e.g., Northwestern Ind. Tel. Co. v. Comm'r, 127 F.3d 643, 647 (7th Cir. 1997) (noting the lack of contemporaneous planning records and

-17-

requirement may be overkill as to the main thrust of the statute, but it obviously serves a valid purpose in preventing contrived <u>post hoc</u> explanations.

Of course, section 533 merely creates a rebuttable presumption that tax avoidance was "a" purpose (the statute says "the" but the Supreme Court says "a" purpose to avoid is enough to condemn an accumulation, <u>Donruss</u>, 393 U.S. at 307-09). The statute provides that unreasonable accumulation is "determinative" against the taxpayer "unless" the taxpayer proves the contrary, so in principle the taxpayer could unreasonably accumulate and still avoid the tax. <u>See</u> 26 U.S.C. § 533(a). But in this case the company has not sought to walk the camel through this aperture in the needle.

<u>Affirmed</u>.

disbelieving <u>ex post</u> justifications), <u>cert. denied</u>, 525 U.S. 810 (1998); <u>Herzog Miniature Lamp Works, Inc.</u> v. <u>Comm'r</u>, 481 F.2d 857, 863 (2d Cir. 1973) (similar).