T.C. Memo. 2022-15

UNITED STATES TAX COURT

CLARY HOOD, INC., Petitioner <u>v.</u>
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 3362-19.                    Filed March 2, 2022.

<u>William C. Elliott, Jr.</u>, <u>Raboteau Terrell Wilder, Jr.</u>, and <u>Stanton P. Geller</u>,

for petitioner.

<u>Joseph D. Stewart-Pirone</u>, <u>Randall S. Trebat</u>, and <u>Creshenole N. Opata</u>, for

respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

GREAVES, <u>Judge</u>:  Respondent determined deficiencies in, and section

6662[1] accuracy-related penalties with respect to, Clary Hood, Inc.'s (petitioner or

---

[1] Unless otherwise noted, all section references are to the Internal Revenue
Code in effect at all relevant times, all dollar amounts are rounded to the nearest

[*2] company) Federal income tax for its tax years ending May 31, 2015 and 2016

(collectively, years at issue),[2] as follows:

| Year | Deficiency | Penalty sec. 6662 |
|------|-----------|-------------------|
| 2015 | $1,581,202 | $316,240 |
| 2016 | 1,613,308 | 322,662 |

Following trial, the issues for decision are: (1) the amount petitioner may

deduct under section 162(a)(1) as reasonable compensation paid to its chief

executive officer (CEO) and shareholder Clary L. Hood (Mr. Hood) during the

years at issue, and (2) whether petitioner is liable for the substantial understatement

accuracy-related penalties under section 6662(a) and (b)(2) for the years at issue.

For the reasons explained below, we hold that petitioner is entitled to deduct no

more than $3,681,269 and $1,362,831 for the 2015 and 2016 tax years,

respectively, and that petitioner is liable for the section 6662 penalty for the 2016

tax year.

---

dollar, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[2] Petitioner reported its tax year ending May 31, 2015 (2015 tax year), on a 2014 Form 1120, U.S. Corporation Income Tax Return, and its tax year ending May 31, 2016 (2016 tax year), on a 2015 Form 1120.

[*3]                        FINDINGS OF FACT

The parties filed a stipulation of facts with accompanying exhibits that are incorporated by this reference.  Petitioner had its principal place of business in South Carolina when the petition was filed.

A.    Clary Hood—The Man

To understand Clary Hood, Inc., one must first know Mr. Hood.  Mr. Hood has dedicated his entire career to the construction profession, specializing in the field of land grading and excavation.  He first learned the craft as a boy from his father, J.E. Hood, who operated his own land grading business.  After school and during summer breaks, J.E. Hood spent time teaching his son how to operate and repair heavy grading equipment, such as tractors and bulldozers.  Upon graduation from high school in 1967, Mr. Hood joined his father's company to acquire further experience in the land grading trade.

B.    Clary Hood—The Business

In 1980 Mr. Hood determined it was time to make his own mark and founded Clary Hood, Inc., with his wife.[3]  Together they served as petitioner's sole

---

[3] At all relevant times, petitioner was a subchapter C corporation and an accrual basis taxpayer for Federal income tax purposes with its headquarters and principal place of business in Spartanburg, South Carolina.

[*4] shareholders and members of the board of directors. Mr. Hood held ultimate decisional control over all of petitioner's operations from its founding through the years at issue. The company focused on land grading and excavation services for construction projects in the South Carolina region, generally acting as a subcontractor. Petitioner started with only two employees and a hodgepodge of used equipment valued at no more than $60,000 before growing into a 150-person company with nearly $70 million in revenue by the end of its 2016 tax year. Success was not immediate or easy as petitioner faced external pressures and undertook significant risks along the way.

From 2000 to 2010 growth was modest and profits irregular, with petitioner realizing less than $1 million in net income after taxes most years. Like other construction businesses in the late 2000s, petitioner found itself in a particularly troubled financial position during the "Great Recession" and sustained three years of operating losses for its tax years ending May 31, 2009 to 2011. Unlike many of its competitors who folded during this period, petitioner survived on its reputation and the following key decisions in which Mr. Hood played an instrumental, if not exclusive, role: (1) conserving cash outlays by maintaining a low debt profile and not declaring dividends; (2) temporarily reducing employee pay; (3) withholding Mr. Hood's salary, when necessary, to ensure that sufficient funds were available

[*5] to cover petitioner's payroll needs; and (4) selling $800,000 of equipment to offset losses and supplement its cash reserves.

As if the challenge of surviving the Great Recession was not enough, petitioner faced yet another existential threat in 2012, this time of its own making. Petitioner abruptly shifted away from one of its largest and most consistent sources of revenue: site grading work for Walmart shopping centers (Walmart projects). Between 1999 and 2011 revenue from Walmart projects generally accounted for more than 20% of petitioner's annual revenue. While petitioner initially welcomed this steady stream of income, the Walmart projects slowly grew into a constant sore for petitioner. Petitioner encountered significant job bidding and pricing pressures from its Walmart projects, which led to weakened operating margins. The Walmart projects also placed significant constraints on petitioner's resources for timely completion, further reducing its ability to pursue other high-paying jobs. It became apparent to Mr. Hood that petitioner needed to shift away from Walmart projects lest it become complacent with these increasingly competitive projects and dwindling profit margins. In summer 2011 Mr. Hood, without seeking input from any of petitioner's other executives, notified the Walmart developer's representative that petitioner would not engage in any future Walmart projects. At the time, petitioner's other executives were caught off guard by the sudden

[*6] decision, with many questioning whether petitioner would survive without this reliable source of revenue. This risky decision would handsomely reward petitioner.

True to Mr. Hood's promise, petitioner started winding down its existing work on Walmart projects in July 2011[4] and began diversifying its customer base by transitioning from retail-related work to the commercial and industrial market sectors. Through Mr. Hood's personal efforts, petitioner quickly landed on the bid list for a sizable prospective project with a zinc recycling plant in North Carolina. Petitioner won that project bid, which over the next several years evolved into the largest and most profitable job in petitioner's history, bringing in over $30 million of revenue and a gross profit margin above 40%. Also in 2011, one of Mr. Hood's industry contacts enabled petitioner to land another large grading project with one of Bridgestone's plants in Aiken, South Carolina. That project accounted for nearly $9.5 million of petitioner's revenue over the next few years, with petitioner realizing an overall gross profit margin of 41%. Around 2014 Mr. Hood's efforts again secured one of petitioner's largest grading jobs, a project for the Tryon

---

[4] The last Walmart project concluded in petitioner's tax year ending May 31, 2013.

[*7] Equestrian Center that by the end of the 2016 tax year had generated over $23 million in revenue and $5.4 million in gross profit for petitioner.

Petitioner's revenue growth and financial performance skyrocketed following its transition away from the Walmart projects, as reflected in the following financial statements for petitioner's tax years ending May 31, 2000 to 2016 (review period):

| Year end | Revenue | Gross income (Loss) | Net income (Loss) before taxes[1] | Shareholders equity | Cash and cash equivalents |
|---|---|---|---|---|---|
| 2016 | $68,834,166 | $22,090,576 | $14,537,867 | $31,262,166 | $15,481,871 |
| 2015 | 44,111,646 | 13,879,822 | 7,088,529 | 21,742,422 | 10,059,619 |
| 2014 | 34,074,836 | 10,008,003 | 8,271,261 | 17,419,060 | 9,434,712 |
| 2013 | 42,830,999 | 11,755,042 | 7,427,560 | 11,965,811 | 5,024,051 |
| 2012 | 23,680,476 | 3,738,212 | 2,308,710 | 7,112,009 | 1,172,793 |
| 2011 | 15,575,546 | 1,072,062 | (120,530) | 5,478,422 | 1,234,290 |
| 2010 | 20,605,072 | 130,997 | (589,730) | 5,550,877 | 1,342,332 |
| 2009 | 27,757,113 | 1,023,856 | (390,922) | 5,910,615 | 923,853 |
| 2008 | 38,439,625 | 5,116,648 | 2,864,533 | 6,186,310 | 1,170,632 |
| 2007 | 25,898,118 | 3,099,005 | 1,294,923 | 4,366,759 | 647,649 |
| 2006 | 14,936,476 | 1,615,374 | 125,617 | 3,554,653 | 657,222 |
| 2005 | 22,150,933 | 2,157,518 | 981,456 | 3,476,981 | 140,955 |
| 2004 | 13,243,547 | 1,826,002 | 874,588 | 2,858,337 | 293,333 |
| 2003 | 9,332,724 | (97,393) | (773,222) | 2,330,395 | 137,797 |
| 2002 | 17,590,697 | 250,363 | (876,490) | 2,822,055 | 120,078 |
| 2001 | 25,347,752 | 1,531,231 | (123,607) | 3,378,880 | 342,416 |
| 2000 | 16,366,605 | 2,235,929 | 833,116 | 3,454,137 | 324,324 |

[1] These totals represent amounts <u>after</u> reduction for Mr. Hood's total purported compensation in the given year. We also note that the total amount of "General and Administrative" expenses for salaries, wages, and bonuses for petitioner's employees as reported in petitioner's audited annual financial

[*8] statements during the review period does not always align with the total amount of annual purported compensation paid to petitioner's employees as reported in the Stipulation of Facts but find such discrepancies immaterial in deciding this case.

Even after its tremendous financial success, petitioner never declared or paid a cash dividend to its shareholders, i.e., Mr. and Mrs. Hood, at any time during the review period.

C.     Petitioner's Executives

Mr. Hood held various titles with petitioner during the review period, but his duties remained relatively constant: (1) oversight of petitioner's fleet of equipment (procurement, use, maintenance, and disposition); (2) hiring, training, and supervision of mechanics; (3) supervision and inspection of jobsites; (4) preparation, review, and approval of job estimates and budgets; (5) submission and negotiation of job bids; (6) setting of employee salaries and bonuses; and (7) acquisition of bonding for projects. He rarely took vacations and typically worked 60-70 hours per week (including weekends).[5] While Mr. Hood's leadership and work ethic contributed to petitioner's exponential growth, petitioner's success would have been fleeting if not for the hard work and

---

[5] Mr. Hood spent approximately two hours each week during the review period managing other business ventures and investments unrelated to petitioner.

[*9] dedication of petitioner's other executives:  Andy Painter, Tom Addley, Chris Phillips, Mrs. Hood, and Wesley Hood (Wesley), Mr. Hood's son.

Like Mr. Hood, Wesley joined his father's business upon graduation from high school.  After several years of operating heavy equipment for the company, Wesley became more involved in petitioner's management.  In the 2000s Mr. Hood conferred the title of president and CEO[6] on Wesley with the expectation that his son would one day take over the reins from Mr. Hood.  Despite his best efforts, the pressures and demands of petitioner's business took a personal toll on Wesley, and he decided to leave petitioner in 2011.

Mr. Painter replaced Wesley as president of petitioner at the beginning of 2012.  Mr. Painter typically worked hours similar to Mr. Hood's, performing the following services:  (1) preparation of estimates for, and bidding on, prospective jobs; (2) oversight of the performance of projects; (3) engaging in business development; and (4) managing petitioner's daily operations, including keeping Mr. Hood apprised of the status of current and prospective projects.  Mr. Hood noted that Mr. Painter would come up with business ideas for petitioner that "paralleled" his own.

---

[6] Wesley's official titles during the review period were:  executive corporate vice president (2001), president (2001 to 2011), and CEO (2006 to 2010).

[*10] Mr. Addley served in a capacity similar[7] to Mr. Painter's and worked primarily as an onsite project manager for petitioner, overseeing the performance of projects. In this role he typically worked 60 hours per week assessing equipment and personnel needs, maintaining client relations at project sites, and monitoring any potential needs for job modifications when warranted.

Mr. Phillips, a certified public accountant (CPA) since 1981, joined petitioner part time in 2010 as its financial controller before becoming petitioner's chief financial officer (CFO) in 2011 and working full time for petitioner starting in 2016. Before joining petitioner, Mr. Phillips had worked in similar positions with other construction and manufacturing firms in the South Carolina region. His duties with petitioner included: (1) oversight of petitioner's finances; (2) reviewing, negotiating, and paying off petitioner's loans; (3) oversight of petitioner's insurance policies; (4) communicating with bonding agents, banks, lenders, attorneys, and government agencies; (5) preparation of petitioner's financial statements; (6) oversight of petitioner's accounting department; and (7) continual review and analysis of petitioner's costs in order to improve

---

[7] Mr. Addley held the official title of vice president from January 9, 2010, until April 17, 2016, and then senior vice president from April 18, 2016, through the end of the review period.

[*11] petitioner's financial efficiency. Through these contributions, Mr. Phillips helped Mr. Hood guide petitioner through the Great Recession and into more prosperous years.

Lastly, Mrs. Hood acted as a general adviser to petitioner on equipment needs, project needs, personnel needs, and financial management. She was also responsible for personal guaranties to bonding companies on behalf of petitioner during the review period. She typically worked approximately 10 hours per week during the review period, but her role with petitioner drastically changed in the later end of the review period for health reasons.

D.   Compensation

1.   Mr. Hood

No written employment agreement existed between Mr. Hood and petitioner during the review period. Rather, petitioner's board of directors, which comprised solely Mr. and Mrs. Hood, set the amount of Mr. Hood's annual compensation, including bonuses. Although they generally solicited and accepted the advice of petitioner's accountants, Mr. and Mrs. Hood did not use any type of formula in setting these amounts during the review period except during the years at issue. Mr. Hood received the following amounts from petitioner during the review period that petitioner characterized as compensation:

[*12]

| Year | Salary | Bonus | Total |
|------|--------|-------|-------|
| 2016 | $196,500 | $5,000,000 | $5,196,500 |
| 2015 | 168,559 | 5,000,000 | 5,168,559 |
| 2014 | 181,538 | 1,500,000 | 1,681,538 |
| 2013 | 381,707 | 1,000,000 | 1,381,707 |
| 2012 | 21,100 | 200,000 | 221,100 |
| 2011 | 83,400 | 35,000 | 118,400 |
| 2010 | 132,500 | -0- | 132,500 |
| 2009 | 130,000 | -0- | 130,000 |
| 2008 | 130,000 | 320,981 | 450,981 |
| 2007 | 130,000 | 221,685 | 351,685 |
| 2006 | 131,000 | 242,000 | 373,000 |
| 2005 | 130,000 | 1,000 | 131,000 |
| 2004 | 130,000 | -0- | 130,000 |
| 2003 | 127,337 | -0- | 127,337 |
| 2002 | 130,813 | -0- | 130,813 |
| 2001 | 130,000 | 107,000 | 237,000 |
| 2000 | 130,000 | 122,000 | 252,000 |

Under petitioner's agreement with its bonding companies, Mr. and Mrs. Hood agreed to guarantee any claim the bonding companies may have had against petitioner during the review period for amounts beyond petitioner's ability to pay (surety bond guaranties). Mr. Hood also agreed to personally guarantee payment of some of petitioner's business loans, credit lines, and capital leases during the review period (debt guaranties), and petitioner likewise lent money and extended credit to Mr. Hood and to some of his other business ventures during the review

[*13] period.  Before the years at issue petitioner never compensated Mr. Hood (or Mrs. Hood) for the debt guaranties or surety bond guaranties.

In fall 2014 Mr. Phillips raised the issue of Mr. Hood's historic compensation with petitioner's accountants at Elliott Davis, LLC (Elliott Davis).  Specifically, Mr. Phillips believed that Mr. Hood had been undercompensated in prior years, and he sought advice on how to compensate Mr. Hood moving forward.  Jeff Greenway, a CPA and audit partner at Elliott Davis and petitioner's outside accountant,[8] sent Mr. Phillips a summary of salary surveys, which included data from a PAS, Inc. (PAS) survey and a 2010 Construction Financial Managers Association survey.  Using this information, Mr. Phillips began to perform preliminary computations to determine the amount petitioner undercompensated Mr. Hood during the review period.

Mr. Phillips, Mr. Hood, Mr. Greenway, and Stacy Stokes, a tax partner at Elliott Davis,[9] discussed Mr. Hood's historic compensation issue more thoroughly during a yearend business meeting for petitioner on May 12, 2015 (May 2015 meeting).  They all agreed that Mr. Hood had been undercompensated during the

[8] Mr. Greenway obtained a South Carolina CPA license in 1985 and served as head of Elliott Davis' construction practice group from 2000 to 2018.

[9] Mr. Stokes obtained a South Carolina CPA license in 1998 and has advised over 20 clients on matters of executive compensation.

**[\*14]** review period for the services he had previously rendered to petitioner and that he deserved a bonus in the amount of $5 million pending followup analyses.

The $5 million amount was supported by an Excel spreadsheet (compensation due spreadsheet) created by Mr. Phillips. The compensation due spreadsheet set forth a model with petitioner's income statements for each year of the review period through May 31, 2015, Mr. Hood's annual reported compensation for each of those years per its Federal returns, and a series of items for each year labeled "Clary Hood Calculated Compensation". The "Clary Hood Calculated Compensation" items comprised the following: (1) a base salary beginning with $200,000 for the tax year ending May 31, 2000, then increasing 5% annually; (2) an annual bonus of 20% of profits before taxes; (3) an annual fee of $100,000 for bonding guaranties; and (4) an annual debt guaranty fee equal to approximately 1% of the debt and capital leases personally guaranteed by Mr. Hood. The spreadsheet also incorporated data from Mr. Greenway's salary surveys. Following the May 2015 meeting, Mr. Stokes provided Mr. Phillips with secondary research on the topic of reasonable executive compensation. Mr. Stokes also modified the compensation due spreadsheet by adding as line items below the income statements a "Total Equity" figure and a "Return on Equity for the year" calculation for each year during the review period. Through these inputs and

[*15] calculations the model arrived at a proposed $5 million purported bonus figure for Mr. Hood.

The board of directors held a meeting on May 21, 2015, in which the board approved $5 million as a bonus to Mr. Hood for its 2015 tax year (2015 amount) "in grateful appreciation of the many years of sacrificial work done [by Mr. Hood] on the [c]ompany's behalf" (backpay compensation). In support the board minutes listed as consideration the following prior services rendered by Mr. Hood during the review period: (1) navigating petitioner through "the loss of a president and long-time vice president in 2011"; (2) deciding "to change direction of the [c]ompany away from 'big box' grading work to more industrial grading opportunities"; (3) "[d]ealing [with] and reacting to the most severe recession faced by the [c]ompany in 2009-2011"; (4) "personally guaranteeing most or all of the [c]ompany debt, capital leases, and credit lines since inception"; (5) acting as the "[p]ersonal guarantor to the [c]ompany's bonding company since inception"; (6) "[p]roviding a steadying influence to both customers, vendors, and, most importantly, employees"; (7) "leading the [c]ompany by being prudent in seeking job opportunities and the purchasing of equipment necessary to handle the [c]ompany's emergent work opportunities"; (8) "personally overseeing that equipment used by Clary Hood, Inc. on job sites met or exceeded expectations in

[*16] the performance of the job"; and (9) "managing and leading the [c]ompany over the most profitable four year run in its existence".[10]  Reciting the same reasoning, petitioner's board approved another $5 million as a bonus to Mr. Hood on May 20, 2016 (2016 amount).

 2. Other Executives

Mr. Hood personally set the salaries and bonuses for all officers and personnel on an individual basis.  For tax years ending May 31, 2010 to 2016,[11] petitioner paid its key officers and executive employees other than Mr. Hood the following amounts that it characterized as compensation (excluding bonuses):

| Year | Andy Painter | Tom Addley | Gail Hood | Chris Phillips | Wesley Hood[1] |
|---|---|---|---|---|---|
| 2016 | $233,654 | $233,654 | $104,800 | $114,900 | $52,000 |
| 2015 | 191,500 | 191,500 | 85,546 | 74,000 | 52,000 |
| 2014 | 178,646 | 178,646 | 56,480 | 52,083 | 52,000 |
| 2013 | 113,907 | 113,907 | 26,000 | 51,454 | 3,000 |
| 2012 | -0- | -0- | 24,220 | 50,824 | 20,520 |
| 2011 | -0- | -0- | 23,680 | 23,400 | 164,080 |
| 2010 | -0- | -0- | 26,500 | 19,600 | 157,000 |

[1] From May 2013 through May 2016 Wesley was not an officer or executive of petitioner and did not provide any material services to petitioner.

---

[10] Petitioner's secretary attached the compensation due spreadsheet to the board meeting minutes at some point after the May 21, 2015, meeting.

[11] No reliable compensation records exist for years before 2010.

[*17] For each tax year ending May 31, 2013 to 2016,[12] petitioner paid its key officers and executive employees other than Mr. Hood the following amounts that it characterized as bonuses:

| Year | Andy Painter | Tom Addley | Gail Hood | Chris Phillips |
|------|--------------|------------|-----------|----------------|
| 2016 | $100,000 | $80,000 | -0- | $60,000 |
| 2015 | 40,000 | 40,000 | -0- | 30,000 |
| 2014 | 30,000 | 30,000 | -0- | 25,000 |
| 2013 | 25,000 | 25,000 | -0- | 25,000 |

E.     Notice of Deficiency and Petition

Following an audit of petitioner's Federal income tax returns, respondent timely issued a notice of deficiency to petitioner for the years at issue.[13] The notice determined that portions of Mr. Hood's purported compensation for the years at issue exceeded reasonable compensation under section 162(a)(1) and disallowed these portions. Specifically, respondent allowed $517,964 of the $5,711,105 total amount petitioner reported as compensation for Mr. Hood for its 2015 tax year and $700,792 of the $5,874,585 total amount petitioner reported for its 2016 tax year. The notice determined total deficiencies of $1,581,202 and

---

[12] No reliable compensation records exist for years before 2013.

[13] Respondent issued a notice of deficiency to petitioner on December 3, 2018, and then mailed a corrected version on or around February 1, 2019.

**[\*18]** $1,613,308 for petitioner's 2015 and 2016 tax years, respectively. The

notice also included accuracy-related penalties under section 6662 for

underpayments due to substantial understatements of income tax of $316,240 and

$322,662 for its 2015 and 2016 tax years, respectively.

In response to the notice of deficiency, petitioner timely filed a petition with

this Court disputing the disallowed amounts and the penalties.

OPINION

I.      Burden of Proof

The Commissioner's determinations set forth in a notice of deficiency are

generally presumed correct, and the taxpayer bears the burden of proving that the

determinations are in error. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115

(1933); see also Cozart Packing Co. v. Commissioner, T.C. Memo. 1972-175

(applying this presumption to a reasonable compensation determination), aff'd, 475

F.2d 1399 (4th Cir. 1973). The taxpayer bears the burden of proving entitlement to

any deduction claimed, INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992),

including for employee compensation paid greater than that determined by the

Commissioner, Miller Mfg. Co. v. Commissioner, 149 F.2d 421, 423 (4th Cir.

1945).

**[*19]** The burden of proof may shift from the taxpayer to the Commissioner in certain circumstances under section 7491(a) but the evidence here does not establish that the burden of proof should shift to respondent under section 7491(a) as to any issue of fact.

II.     Reasonable Compensation

     A.     Deduction Requirements

          1.     Section 162(a)

Petitioner, a subchapter C corporation, is subject to Federal income tax on its taxable income, which is its gross income less allowable deductions. See secs. 11(a), 61(a), 63(a). A corporation may deduct all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a reasonable allowance for salaries or other compensation, e.g., bonuses, for personal services actually rendered. Sec. 162(a)(1); secs. 1.162-7(a), 1.162-9, Income Tax Regs. Whether payments are reasonable and purely for services is a question of fact to be determined from all the facts and circumstances of each particular case. Martens v. Commissioner, 934 F.2d 319, 1991 WL 87160, at *8 (4th Cir. 1991), aff'g per curiam T.C. Memo. 1990-42; Am. Sav. Bank v. Commissioner, 56 T.C. 828, 843 (1971); see also sec. 1.162-7(b)(3), Income Tax Regs. (providing that reasonable and true compensation is only such an amount "as

[*20] would ordinarily be paid for like services by like enterprises under like circumstances").

An employer may deduct compensation paid to an employee in a year although the employee may have performed the services in a prior year.[14]  Lucas v. Ox Fibre Brush Co., 281 U.S. 115, 119 (1930), aff'g Ox Fibre Brush Co. v. Blair, 32 F.2d 42 (4th Cir. 1929), rev'g 8 B.T.A. 422 (1927); R.J. Nicoll Co. v. Commissioner, 59 T.C. 37, 50 (1972).  The employer must show that the employee was not sufficiently compensated in the prior year and that the current year's compensation was in fact to compensate for that underpayment.  Estate of Wallace v. Commissioner, 95 T.C. 525, 553-554 (1990), aff'd, 965 F.2d 1038 (11th Cir. 1992).

Another consideration is whether the employee was also a shareholder of the corporation.  Where officer-shareholders are in control of a closely held corporation and set their own compensation, careful scrutiny is required to determine whether the alleged deductible compensation is in fact a nondeductible dividend.  Richlands Med. Ass'n v. Commissioner, 953 F.2d 639, 1992 WL 14603, at *2 (4th Cir. 1992), aff'g per curiam T.C. Memo. 1990-660; Estate of Wallace v.

---

[14] Respondent does not argue that any portion of the compensation paid to Mr. Hood should have been reported in a year other than the years at issue.

[*21] <u>Commissioner</u>, 95 T.C. at 556. An "ostensible salary" paid by a closely held corporation to one of its few shareholders is likely to constitute a disguised dividend where the amount is "in excess of those ordinarily paid for similar services and the excessive payments correspond or bear a close relationship to the stockholdings of the officers or employees". Sec. 1.162-7(b)(1), Income Tax Regs.

### 2. Multifactor Approach

The U.S. Court of Appeals for the Fourth Circuit, the court to which an appeal of this case would lie, <u>see</u> sec. 7482(b), requires consideration of multiple factors in determining reasonable compensation (multifactor approach): the employee's qualifications; the nature, extent, and scope of the employee's work; the size and complexities of the business; a comparison of salaries paid with gross income and net income; the prevailing general economic conditions; comparison of salaries with distributions to stockholders; the prevailing rates of compensation for comparable positions in comparable concerns; and the salary policy of the taxpayer as to all employees. <u>Richlands Med. Ass'n v. Commissioner</u>, 1992 WL 14603, at *2.

In the context of small corporations with a limited number of officers, additional factors may include the amount of compensation paid to the particular employee in the previous years, <u>Mayson Mfg. Co. v. Commissioner</u>, 178 F.2d 115,

**[\*22]** 119 (6th Cir. 1949), rev'g and remanding a Memorandum Opinion of this Court dated Nov. 16, 1948, and personal guaranties of debts or other obligations of the corporation, E.J. Harrison & Sons, Inc. v. Commissioner, T.C. Memo. 2003-239, 2003 WL 21921049, at \*14-\*16, aff'd in part, rev'd in part and remanded on another issue, 138 F. App'x 994 (9th Cir. 2005).

No single factor is decisive; instead, we must consider and weigh the totality of the facts and circumstances when making a decision. Martens v. Commissioner, 1991 WL 87160, at \*9. In doing so, we may find certain factors less relevant or helpful than other factors when considering the facts necessary to reach a conclusion. See Medina v. Commissioner, T.C. Memo. 1983-253.

### 3. Independent Investor Test

Some Federal courts have supplemented, hybridized, or completely replaced the multifactor approach for analyzing the reasonableness of shareholder-employee compensation with the so-called independent investor test. See Metro Leasing & Dev. Corp. v. Commissioner, 376 F.3d 1015, 1019 (9th Cir. 2004) (noting that the independent investor test is but one of many factors to be considered when assessing the reasonableness of an executive officer's compensation), aff'g T.C. Memo. 2001-119, 2001 WL 530694, and 119 T.C. 8 (2002); Haffner's Serv. Stations, Inc. v. Commissioner, 326 F.3d 1, 3-4 (1st Cir. 2003) (rejecting the

**[\*23]** independent investor test as the exclusive test and applying the multifactor approach through consideration of a company's profit and return on equity), aff'g T.C. Memo. 2002-38; Exacto Spring Corp. v. Commissioner, 196 F.3d 833, 838 (7th Cir. 1999) (relying primarily on the independent investor test), rev'g Heitz v. Commissioner, T.C. Memo. 1998-220; Dexsil Corp. v. Commissioner, 147 F.3d 96, 101 (2d Cir. 1998) (applying the multifactor approach through the lens of an independent investor), vacating T.C. Memo. 1995-135; Owensby & Kritikos, Inc. v. Commissioner, 819 F.2d 1315, 1327 (5th Cir. 1987) ("The so-called independent investor test is simply one of the factors a court should consider[.]"), aff'g T.C. Memo. 1985-267.

Under this standard, a court typically asks "whether an inactive, independent investor would be willing to compensate the employee as he was compensated." Elliotts, Inc. v. Commissioner, 716 F.2d 1241, 1245 (9th Cir. 1983), rev'g T.C. Memo. 1980-282. If so there may be a strong inference or even presumption under this test that the employee provided reasonable compensable services and that corporate profits are not being siphoned out as dividends disguised as salary. See id. at 1247.

Petitioner contends that we should follow the independent investor test in determining whether the purported compensation paid to Mr. Hood in the years at

[*24] issue was reasonable. While at least one Court of Appeals has found value in this approach, the U.S. Court of Appeals for the Fourth Circuit has not adopted any iteration of the independent investor test. Moreover, we generally apply the multifactor approach unless a case is appealable to a Court of Appeals which has expressly applied the independent investor test. See, e.g., Pepsi-Cola Bottling Co. of Salina v. Commissioner, 61 T.C. 564, 567 (1974) (noting that it is "well settled" that the Court should consider the multifactor approach in reasonable compensation cases), aff'd, 528 F.2d 176, 179 (10th Cir. 1975); Beiner, Inc. v. Commissioner, T.C. Memo. 2004-219, 2004 WL 2164888, at *15 (refusing to apply the independent investor test exclusively by finding comparative industry salaries the most relevant factor in that case); Metro Leasing & Dev. Corp. v. Commissioner, 2001 WL 530694, at *9 (concluding that it was not "appropriate to rely solely on the independent investor test to reach our findings and/or holding"). Accordingly, we will apply the multifactor approach to determine the reasonableness of petitioner's purported compensation paid to Mr. Hood on the basis of the precedent of this Court and, more importantly, of the Court of Appeals for the Fourth Circuit. See Golsen v. Commissioner, 54 T.C. 742, 757 (1970), aff'd, 445 F.2d 985 (10th Cir. 1971).

**[\*25]** B.     Mr. Hood's Compensation

There is no doubt that Mr. Hood is the epitome of the American success story; his efforts directly contributed to petitioner's prosperity during the review period.  Furthermore, the parties do not dispute that Mr. Hood was entitled to some degree of additional compensation for the prior services he rendered as an employee of petitioner during portions of the review period.  Neither this Court nor respondent should substitute its or his own business judgment for that of petitioner as to the setting of the appropriate amount of a given employee's compensation; however, we do examine the extent to which that compensation may be deducted for Federal income tax purposes because, as even petitioner recognizes, limits do exist for what may be reasonably deducted as compensation.  Accord Owensby & Kritikos, Inc. v. Commissioner, 819 F.2d at 1325.

Respondent challenges from a Federal income tax perspective whether the dramatic increase in Mr. Hood's purported compensation in petitioner's 2015 and 2016 tax years constituted deductible compensation or a means of draining corporate profits through a disguised dividend.  See Nowland v. Commissioner, 244 F.2d 450, 455 (4th Cir. 1957), aff'g T.C. Memo. 1956-72; Ox Fibre Brush Co. v. Blair, 32 F.2d at 45.  For the reasons explained below, we hold that petitioner may not deduct the full amount of purported compensation paid to Mr. Hood

**[\*26]** because it failed to adequately establish how the entire amount was both reasonable and paid solely as compensation for his services to petitioner during the review period.

### 1. Mr. Hood's Background and Qualifications

An employee's superior qualifications for his or her position may justify high compensation. See Home Interiors & Gifts, Inc. v. Commissioner, 73 T.C. 1142, 1158 (1980); Wagner Constr., Inc. v. Commissioner, T.C. Memo. 2001-160, 2001 WL 739234, at \*22. With over 50 years of relevant work experience, Mr. Hood had substantial knowledge and experience in both managing and performing land-grading and excavation work. Furthermore, he had developed an excellent reputation in his market, which allowed his eponymous company to compete for, and win, subcontracting jobs.

### 2. Nature, Extent, and Scope of Mr. Hood's Work

An employee's position, duties performed, hours worked, and general importance to the corporation's success may justify high compensation. K & K Veterinary Supply, Inc. v. Commissioner, T.C. Memo. 2013-84, at \*12 (citing Charles Schneider & Co. v. Commissioner, 500 F.2d 148, 152 (8th Cir. 1974), aff'g T.C. Memo. 1973-130). Mr. Hood was petitioner's key employee and driving force from its inception, and his personal services were essential to its

[*27] success. He managed and built up petitioner's business, solicited and obtained petitioner's jobs, and supervised all work performed. Furthermore, he made the pivotal decision to sever petitioner's business dealings with Walmart and transition to the commercial and industrial market sectors, which led to petitioner's significant financial growth.

### 3. Size and Complexity of Petitioner's Business

Courts may consider the size and complexity of a taxpayer's business when deciding the reasonableness of compensation paid to its shareholder-employees. See Richlands Med. Ass'n v. Commissioner, 1992 WL 14603, at *2; RTS Inv. Corp. v. Commissioner, 877 F.2d 647, 651 (8th Cir. 1989), aff'g T.C. Memo. 1987-98. A company's size is determined by its sales, net income, gross receipts, or capital value. See Beiner, Inc. v. Commissioner, 2004 WL 2164888, at *12; Wagner Constr., Inc. v. Commissioner, 2001 WL 739234, at *23.

During the review period petitioner experienced exceptional growth in terms of both employees and revenue. The workforce went from approximately 80 to 150 employees, and annual revenue jumped from as low as $9 million in 2003 to over $68 million by 2016. Even if we were to assume that land excavation and grading does not require substantial scientific or technical knowledge, petitioner's work is more complex than that of a general construction company. See Wagner

[*28] Constr., Inc. v. Commissioner, 2001 WL 739234, at *23 (recognizing differences in complexity among construction companies); Choate Constr. Co. v. Commissioner, T.C. Memo. 1997-495 (finding greater complexity in specialty construction firms). Petitioner specialized in the land grading and excavation field, which entails performance of the following services at exacting specifications: earth excavation, site clearing and grading, storm drainage, installation of water systems, installation of curbs and gutters, landscaping, and irrigation services. Through Mr. Hood's contributions, petitioner crafted a niche in that specialty by competing in a cost-effective manner and developing an unwavering reputation in its market.

4. Comparison of Mr. Hood's Compensation to Petitioner's Income

Although it is often helpful to consider compensation as a percentage of both gross receipts and net income, net income is usually more important because it more accurately gauges whether a corporation is disguising the distribution of dividends as compensation. See, e.g., Richlands Med. Ass'n v. Commissioner, 1992 WL 14603, at *2; Wagner Constr., Inc. v. Commissioner, 2001 WL 739234, at *25. A taxpayer's pattern of attempting to distribute a significant portion of its net pretax income as deductible compensation to employee-shareholders rather than as nondeductible dividends such that the corporation has relatively little

[*29] taxable income after deducting the "compensation" may be an indicator of a taxpayer's disguising dividends as compensation. See Alpha Med., Inc. v. Commissioner, 172 F.3d 942, 948 (6th Cir. 1999), rev'g on other grounds T.C. Memo. 1997-464; Aspro, Inc. v. Commissioner, T.C. Memo. 2021-8, at *44-*45. However, no particular ratio between compensation and gross or net taxable income is a prerequisite for a finding of reasonableness. See Owensby & Kritikos, Inc. v. Commissioner, 819 F.2d at 1326.

Petitioner paid approximately 42% and 26% of its pretax income to Mr. Hood as purported compensation in its 2015 and 2016 tax years, respectively.[15] While such amounts are not insignificant, we do not necessarily find them telling of an egregious pattern of disguised dividends as traditionally understood under this factor when considering that such amounts are principally meant to reflect compensation for Mr. Hood's prior years of service during the review period.[16] Cf. Aspro, Inc. v. Commissioner, at *45 (holding taxpayer's total shareholder "compensation" of 90%, 100%, and 67% of net income to be unreasonable); Miller

---

[15] To compute these percentages, we divided Mr. Hood's total purported compensation each year by petitioner's annual net income (before taxes and payment of Mr. Hood's total purported annual compensation).

[16] Excluding the years at issue, petitioner generally paid Mr. Hood no more than 25% of petitioner's pretax income during the review period.

[*30] & Sons Drywall, Inc. v. Commissioner, T.C. Memo. 2005-114, 2005 WL 1200189, at *13 (holding shareholder "compensation" of 89%, 108%, and 74% of net income to be unreasonable).

### 5.    Prevailing Economic Conditions

This factor helps to determine whether the success of a business may be attributable to the efforts and business acumen of the employee in question, as opposed to general economic conditions.  Wagner Constr., Inc. v. Commissioner, 2001 WL 739234, at *23.  Adverse economic conditions, for example, tend to show that an employee's skill was important to a company that grew during bad economic years.  Id.

Petitioner's revenue increased from approximately $16 million to over $68 million during the review period, a trend that cannot be credited to economic conditions alone.  Mr. Greenway, a CPA with extensive experience in the construction industry, offered credible testimony attributing petitioner's success, at least in the post-Walmart era, to factors other than general economic conditions. He testified that petitioner was his most profitable construction client between 2013 and 2016.  Respondent's expert witness offered further confirmation of this view.  He placed petitioner's performance in the upper quartile of its industry peers for the post-Walmart era in which petitioner attained its most profitable jobs

**[*31]** through the direct involvement of Mr. Hood.  It is therefore only fitting to recognize Mr. Hood's contributions to petitioner's success outside of general economic conditions.

Mr. Hood also testified that, although petitioner's poorest performance years were predominantly attributable to years of national economic contractions, many of petitioner's competitors went out of business during these economic downturns. Mr. Hood, on the other hand, took active measures as CEO to ensure petitioner's survival during such periods by selling equipment, reducing employee compensation, including his own when needed, and conserving financial resources. Such actions further illustrate the importance of Mr. Hood's role within the company even during economically turbulent years.

6. Comparison of Mr. Hood's Compensation With Distributions to Stockholders

It is not a legal requirement for a corporation to pay dividends as shareholders are often content with the appreciation in the value of their stock that arises through retention of earnings.  Estate of Wallace v. Commissioner, 95 T.C. at 559.  However, a complete absence of dividends to shareholders out of available profits justifies an inference that some of the purported compensation paid to a shareholder-employee represents a distribution of profits.  Paul E. Kummer Realty Co. v. Commissioner, 511 F.2d 313, 315 (8th Cir. 1975), aff'g T.C. Memo.

[*32] 1974-44; Nor-Cal Adjusters v. Commissioner, 503 F.2d 359, 362-363 (9th Cir. 1974), aff'g T.C. Memo. 1971-200; Charles Schneider & Co. v. Commissioner, 500 F.2d at 153 (noting this fact to be "[p]erhaps [the] most important" in finding purported shareholder compensation represented disguised distributions); Estate of Wallace v. Commissioner, 95 T.C. at 559; Aspro, Inc. v. Commissioner, at *22-*23.

Petitioner was profitable during the review period, especially in the years at issue, but never declared or paid a cash dividend. Some of petitioner's claimed reasons for not doing so, e.g., to meet working capital needs during the Great Recession and maintain a competitive edge through strong balance sheets, are certainly persuasive when considering tax years such as 2010 in which business was slow and capital needs were high. These reasons, however, can be carried only so far before they start to lose their appeal after taking into account: (1) Mr. Hood's decision, as controlling shareholder of petitioner, to defer monetary recognition through a dividend for his investment for the entire 16-year review period and (2) petitioner's decision to not recognize those deferrals through a dividend but instead reward Mr. Hood exclusively through a purported bonus after

[*33] it had acquired sufficient capital and cash in the years at issue to do so.[17]  See Mulcahy, Pauritsch, Salvador & Co. v. Commissioner, 680 F.3d 867, 873 (7th Cir. 2012) ("When a person provides both capital and services to an enterprise over an extended period, it is most reasonable to suppose that a reasonable return is being provided for both aspects of the investment, and that a characterization of all fruits of the enterprise as salary is not a true representation of what is happening." (quoting 1 Boris I. Bittker & Lawrence Loken, Federal Taxation of Income, Estates & Gifts, para. 22.2.2, at 22-26 (3d ed. 1999))), aff'g T.C. Memo. 2011-74.

7.       Prevailing Rates of Compensation for Comparable Positions in Comparable Concerns

In deciding whether compensation to an employee is reasonable, we compare it to compensation paid to persons holding comparable positions in comparable companies.  Mayson Mfg. Co. v. Commissioner, 178 F.2d at 119; Pepsi-Cola Bottling Co. of Salina v. Commissioner, 61 T.C. at 567; sec.

---

[17] Petitioner's strengthened financial ability to disperse significant sums of cash by the years at issue is evidenced by:  (1) petitioner's 2010 yearend stockholder equity value increasing nearly sixfold by 2016 and its 2010 cash balance increasing nearly fifteenfold by 2016; (2) the actual outlay of cash to Mr. Hood in the form of purported bonuses during the years at issue; and (3) Mr. Hood's testimony that by 2015 he recognized that his historic rationale for not taking money out of the company was no longer as applicable as it had been in the past.

**[*34]** 1.162-7(b)(3), Income Tax Regs. Courts frequently place great emphasis on this factor. E.g., Rutter v. Commissioner, 853 F.2d 1267, 1273 (5th Cir. 1988) (observing that courts have viewed this factor as the most relevant), aff'g T.C. Memo. 1986-407; Beiner, Inc. v. Commissioner, 2004 WL 2164888, at *15 (same).

In assessing this factor, we consider the testimony of the parties' expert witnesses. As trier of fact, we are not bound by the opinion of any expert witness and will accept or reject expert testimony, in whole or in part, in the exercise of sound judgment. Helvering v. Nat'l Grocery Co., 304 U.S. 282, 295 (1938); Estate of Hall v. Commissioner, 92 T.C. 312, 338 (1989); Parker v. Commissioner, 86 T.C. 547, 561 (1986).

a. Kursh

Petitioner first offered the expert testimony of Samuel Kursh of BLDS, LLC (BLDS), an economic consulting firm. Mr. Kursh is an economist and principal of BLDS whose experience includes matters relating to corporate finance and market database analysis, as well as return on equity calculations.

His expert report (BLDS report), which under Rule 143(g)(2) served as his direct testimony, indicated that Mr. Kursh wrote it along with his colleague Dr. Brett Margolin, but Mr. Kursh's knowledge as to the report's content, supporting

[*35] data, and calculations was materially lacking. Mr. Kursh admitted that Dr. Margolin would be better suited to answer basic questions regarding the BLDS report despite the fact that Dr. Margolin was not a witness in this trial.

The BLDS report also lacked necessary supporting calculations and did not include all underlying data, leaving us unable to verify the veracity of its findings and conclusions. See Fed. R. Evid. 702 (requiring expert testimony be helpful to the trier of fact, based on sufficient data, and the product of reliable principles and methods); Rule 143(g) (stipulating that any facts or data considered by an expert witness in forming his report be fully disclosed and a failure to comply with this requirement is grounds for exclusion of such testimony); Wycoff v. Commissioner, T.C. Memo. 2017-203, at *42-*43 (rejecting expert witness findings based on the expert's failure to disclose underlying data). The BLDS report additionally rested on numerous dubious assumptions. Perhaps most egregious, the BLDS report crudely compared the performance of petitioner, a private regional specialty construction firm, to that of dissimilar public companies such as the multinational conglomerate Caterpillar, Inc., with little attempt at adjusting for the obvious and stark differences between such companies. The BLDS report likewise compared petitioner's book-value return on equity to the benchmarked public companies' market returns without accounting for cash dividends and without credibly

[*36] establishing a correlation between these separate performance measurements. Finally, the BLDS report focused on the independent investor test, which we do not find to be controlling.[18]

We therefore cannot say that the BLDS report represents a reliable indicator of what other similarly situated companies would be willing to pay persons in positions comparable to Mr. Hood's and, accordingly, afford Mr. Kursh's testimony little to no weight. See Parker v. Commissioner, 86 T.C. at 561 (holding that the Court is not bound by an expert's opinion, and we may either accept or reject expert testimony in the exercise of sound judgment).

      b.    Sharp

Petitioner also offered the expert testimony of Theodore Sharp, a senior partner at the management consulting firm Korn Ferry. Mr. Sharp is a member of Korn Ferry's Executive Pay and Governance group and specializes in compensation-related issues, including executive compensation benchmarking.

---

[18] Even if we did place greater emphasis on this test, there are serious doubts as to whether it was properly applied in the BLDS report.

**[\*37]** Mr. Sharp testified that he reviewed and agreed with his expert report (Korn Ferry report) but acknowledged that he had not written it.[19] The Korn Ferry report consisted of approximately one dozen PowerPoint slides in bullet-point format. As with the BLDS report, supporting calculations used to reach key findings and conclusions were conspicuously absent from the report and underlying data sources were not adequately disclosed. See Fed. R. Evid. 702; Rule 143(g); Purple Heart Patient Ctr., Inc. v. Commissioner, T.C. Memo. 2021-38, at \*16-\*22.

There were also serious concerns as to the soundness of the assumptions in the Korn Ferry report. For example, the Korn Ferry report relied on compensation survey data for companies with up to $500 million in annual revenue and attempted to offset the disparity with petitioner's revenue size by applying a 20% "discount" to the data. The Korn Ferry report explained (and Mr. Sharp confirmed at trial) that this particular percentage was chosen "based on our experience working with similarly sized companies". See Purple Heart Patient Ctr., Inc. v. Commissioner, at \*18 ("While an expert can be qualified on the basis of his experience, he cannot cite his experience as the sole basis for his opinion.");

---

[19] The Korn Ferry report was originally written by a different employee of Korn Ferry in 2018, then later reviewed and adopted by Mr. Sharp in 2020 after the author left Korn Ferry.

[*38] <u>Feinberg v. Commissioner</u>, T.C. Memo. 2017-211, at *9 (excluding expert testimony where the expert did not provide sufficient data to show that "the opinions expressed are based on anything other than his own conjecture"), <u>aff'd</u>, 916 F.3d 1330 (10th Cir. 2019). The Korn Ferry report similarly made an adjustment to the survey data by "aging"[20] it by a linear factor of 2.5% per year during the review period without citing support for this assumed rate outside of the expert's own experience.

The external compensation survey data relied upon in the Korn Ferry report was materially lacking in completeness as well. Mr. Sharp acknowledged that the report's analysis was based on only a handful of years of actual survey data. Similarly, the Korn Ferry report relied on data from at least two data sets; but because the source data sets were not disclosed in the report itself, respondent's expert witness was unable to form an opinion as to whether the data sets were combined correctly, which databases were actually applied in the report's analysis, how the data sources were weighted, and whether the data was industry specific. Finally, the Korn Ferry report exhibited an incomplete application and

---

[20] The Korn Ferry report explained that "'[a]ging data' is an approach * * * use[d] to adjust market survey data * * * published in different years * * * by a percentage assumed to be representative of wage movement to bring * * * data to a consistent point in time."

[*39] understanding of petitioner's facts. In one instance it referred to the following unsupported factual assertion: "There was [a] full understanding [between petitioner and Mr. Hood] that if and when the business turned around, there would be catch up [in Mr. Hood's pay] to the extent affordable". More critically, the Korn Ferry report failed to correctly account for all known amounts of purported compensation paid to Mr. Hood during the review period.

We therefore afford Mr. Sharp's testimony little to no weight.

c.    Fuller

Respondent offered the expert testimony of David Fuller, founder of Value, Inc. In his role at Value, Inc., Mr. Fuller provides financial and valuation consulting services to corporate clients in multiple industries, including construction. His practice area includes the offering of valuation opinions for financial and tax reporting matters, and he routinely renders advice on the issue of executive compensation.

Mr. Fuller's expert report (Fuller report) most accurately accounted for all known amounts of purported compensation paid to Mr. Hood during the review period and contained detailed disclosures of data sources relied upon, methodologies used, and supporting calculations. The data Mr. Fuller used spanned the entire 17-year review period, with Mr. Fuller comparing petitioner's

[*40] performance against data supplied by the Risk Management Association (RMA) survey service for site preparation contractors, using petitioner's annual asset[21] and revenue[22] size. The Fuller report placed petitioner in annual quartiles based on the company's performance against the RMA data in a given year and then examined officer compensation as a percentage of revenue within the respective annual performance quartile. As part of his analysis, Mr. Fuller also observed compensation data for employee-shareholders in the construction industry from the survey service PAS and took into account the multifactor approach.

On the basis of the surveys and data, Mr. Fuller concluded that in terms of financial metrics petitioner was a lower quartile performing business from 2000 through 2011, a median performing business in 2012, and an upper quartile performing business from 2013 through 2016. Accordingly, Mr. Fuller assigned

---

[21] RMA segregated companies by reported assets in groups of $0.0 to $0.5 million, $0.5 million to $2 million, $2 million to $10 million, $10 million to $50 million, $50 million to $100 million, and $100 million to $250 million.

[22] RMA segregated companies by reported revenue in groups of $0.0 to $1 million, $1 million to $3 million, $3 million to $5 million, $5 million to $10 million, $10 million to $25 million, and $25 million and over.

[*41] lower quartile wages for a board chairman[23] to Mr. Hood for 2000 to 2011, average wages for a board chairman to Mr. Hood for 2012, and the highest level of compensation (99th percentile) for 2013 through 2016. He also found that elected undercompensation by an owner is not dissimilar to a loan to a business. Therefore, he calculated interest each year on Mr. Hood's calculated undercompensation.

The Fuller report contained two opinions. In the first opinion (primary opinion), Mr. Fuller concluded reasonable compensation for Mr. Hood to be $3,681,269 for the 2015 tax year and $1,362,831 for the 2016 tax year. As part of this determination, he included compensation to Mr. Hood for the surety bond guaranties.[24] The second opinion (alternative opinion) excluded compensation for the surety bond guaranties as Mr. Fuller noted that the PAS survey may have already included such guaranties in the industry data for a board chairman. The

---

[23] The PAS survey lists salaries according to position, with board chairman being the highest compensation level. Mr. Fuller applied the board chairman figures because of Mr. Hood's duties and his role as the most senior executive at petitioner.

[24] Mr. Fuller did not assign compensation to Mr. Hood for the debt guaranties because he found that such guaranties were offset by the credit and loans that petitioner extended to Mr. Hood and his other companies.

[*42] alternative opinion ultimately concluded reasonable compensation for Mr. Hood to be $2,202,063 for the 2015 tax year and $1,314,500 for the 2016 tax year.

Despite a greater allowable amount than determined by respondent in his revised notice of deficiency,[25] petitioner disagrees with Mr. Fuller's opinion and asks us to reject his report in its entirety. One of the principal reasons petitioner posits rejection of this report is its allegation that the Fuller report is "statistically invalid" because Mr. Fuller used data from the RMA and PAS survey services. As petitioner's own expert witness, Mr. Sharp, admitted, there is no such thing as "perfect data" when it comes to executive compensation, and we do not find these services intrinsically defective or inappropriate for the purposes at hand. See, e.g., Aspro, Inc. v. Commissioner, at *43 (relying on PAS survey data for an executive compensation determination); Cavallaro v. Commissioner, T.C. Memo. 2019-144, at *19-*20 (same for RMA). Petitioner's other expert witness, Mr. Kursh, even relied on RMA data in the BLDS report. Likewise, petitioner's external adviser, Mr. Greenway, used PAS survey data, which petitioner's CFO found "helpful". Therefore, while such benchmark data may not be as statistically exacting as

---

[25] Respondent conceded after trial that Mr. Fuller's alternative opinion represents the correct determination of the maximum amounts of compensation that should be considered reasonable for Mr. Hood for the years at issue.

**[*43]** petitioner would like, petitioner did not provide satisfactory countervailing evidence through its expert witnesses that would credibly support a greater allowable amount. See Miller Mfg. Co. v. Commissioner, 149 F.2d at 423 (noting the taxpayer bears the burden of proving entitlement to any deduction claimed for employee compensation paid greater than that determined by the Commissioner). In this absence we are left looking to Mr. Fuller's report as the most credible and complete source of data, analyses, and conclusions in the record regarding what similar companies might be willing to pay Mr. Hood on petitioner's facts.

### d. Extraordinary or Unique Services

Petitioner contends that Mr. Hood's role in petitioner's growth and success should be seen as extraordinary or unique such that we place less reliance on industry comparisons. See, e.g., id. at 424; Smoky Mountains Beverage Co. v. Commissioner, 22 T.C. 1249, 1255 (1954). We agree with petitioner that Mr. Hood is extraordinarily talented in his industry and that perhaps few other individuals could have achieved similar results for petitioner during the later years of the review period. However, petitioner fails to appreciate that these considerations were taken into account in the expert witnesses' reports. Mr. Fuller's report specifically placed petitioner's performance in the highest tier group of its comparable industry peers for years 2013 to 2016. Accordingly, we see no

**[\*44]** reason to discount reports that already sufficiently factor in Mr. Hood's extraordinary contributions to petitioner.

### 8. Petitioner's Salary Policy as to All Employees

Courts have considered salaries paid to other employees of a business in deciding whether compensation is reasonable. See Home Interiors & Gifts, Inc. v. Commissioner, 73 T.C. at 1162. We look to this factor to determine whether Mr. Hood was compensated differently from petitioner's other employees solely because of his status as a shareholder. See Northlich, Stolley, Inc. v. United States, 368 F.2d 272, 278 (Ct. Cl. 1966) (finding a constructive dividend where compensation paid to stockholding officers greatly exceeded that of nonstockholding employees).

Petitioner had no structured system in place for the setting of its nonshareholder employee compensation. Mr. Hood personally set the salary and bonus amounts of other employees and officers and testified that he based these decisions on his own subjective belief as to the individual's "work records", "ability to get along with people", and "pride in the company".[26] Mr. Hood's salary and bonus in the years at issue represented almost 90% of the total amount

---

[26] Mr. Hood's son, Wesley, also participated to some extent in these decisions when he was an officer of petitioner.

[*45] of compensation that petitioner paid to its officers despite the fact that nonshareholder officers such as Mr. Painter and Mr. Addley worked nearly the same number of hours as Mr. Hood and shared in many of Mr. Hood's responsibilities.

Petitioner had no agreement in place with Mr. Hood regarding his compensation. Mr. Hood's compensation during the review period was instead set by him along with his wife in their roles as petitioner's board of directors. Because such conditions can be ripe for the existence of disguised dividends, see, e.g., Estate of Wallace v. Commissioner, 95 T.C. at 553-554, we examine further the specific circumstances surrounding the setting of Mr. Hood's compensation in the years at issue.

a.      2015 Amount

The 2015 amount was initially proposed at the May 2015 meeting by Mr. Phillips, Mr. Hood, and petitioner's external advisers at Elliott Davis in which the meeting participants tentatively agreed on a bonus amount of $5 million for Mr. Hood. In arriving at this amount, petitioner and its advisers had the advantage of knowing its anticipated yearend profits for the 2015 tax year, which was expected to be petitioner's most successful year in its corporate history. Despite the fact that petitioner never paid Mr. Hood a dividend, petitioner continued with its plan to

[*46] award Mr. Hood only a purported bonus in a lump sum. See Pac. Grains, Inc. v. Commissioner, 399 F.2d 603, 607 (9th Cir. 1968) (finding the failure of a successful company "to pay any dividends while radically increasing the compensation of its sole shareholder" is particularly telling of a disguised dividend), aff'g T.C. Memo. 1967-7; Ox Fibre Brush Co. v. Blair, 32 F.2d at 46 ("A corporation with a large surplus in a given year may attempt to dispose of that surplus in the guise of salaries and thereby evade its full tax burden[.]"); see also Commissioner v. R.J. Reynolds Tobacco Co., 260 F.2d 9, 12 (4th Cir. 1958) (noting that lump-sum payments "may be partly compensation for services and partly dividends"), aff'g T.C. Memo. 1956-161.

Petitioner also used its own performance as a proxy for Mr. Hood's performance with the board minutes citing only overarching contributions by Mr. Hood to petitioner over the review period without any attempt to value or quantify the specific services rendered by Mr. Hood over the review period (other than his debt guaranties). See Ox Fibre Brush Co. v. Blair, 32 F.2d at 45 (noting that a taxpayer must be able to demonstrate how amounts paid are not "utterly disproportionate to the value" of the services rendered); Aspro, Inc. v. Commissioner, at *27-*33 (finding a taxpayer's failure to attempt to outline and attach dollar values to the individual services performed and attribute those

[*47] amounts to purported compensation indicated that those amounts were not truly compensation for services rendered); Woesner Abstract & Title Co. v. Commissioner, T.C. Memo. 1983-764 (finding a disguised dividend where a closely held company failed to attempt to allocate amounts of purported compensation among the various services rendered by the employee-shareholder). Such a comparison may make sense for a one-man enterprise; however, petitioner employed dozens of hardworking employees during the review period and conceded that the company's growth during this time could not be tied exclusively to Mr. Hood's efforts.  Petitioner did not provide evidence to support what portion of the company's growth should reasonably be attached to each of the various services, including possible values thereof, rendered by Mr. Hood during the review period as opposed to that of the other officers and employees.

Finally, and perhaps most telling, there was Mr. Hood's testimony during trial.  When asked why he considered it acceptable to take a significant amount of money out of the company starting in the 2015 tax year despite his reluctance to do so in the past, Mr. Hood admitted that he was aware that he needed to start making necessary preparations from an "income tax" perspective in "getting money out of" the company in anticipation of "a changing of the guard".

**[\*48]**          b.          2016 Amount

In awarding Mr. Hood the 2016 amount, petitioner acted under the awareness that, on the basis of its preliminary financials, its 2016 tax year was to be even more profitable than 2015.  Nevertheless, petitioner again chose not to declare a dividend but instead to reward Mr. Hood exclusively through another $5 million bonus, reciting the same underlying rationale it provided for the 2015 amount but without any attempt at explaining why the 2015 amount had been insufficient backpay compensation for Mr. Hood's prior services during the review period.  This absence is particularly notable when considering that the record also does not show that, when awarding Mr. Hood the 2015 amount, petitioner felt Mr. Hood remained undercompensated or that additional backpay compensation might be warranted in the future for these prior services.

Petitioner nevertheless attempts to distinguish its legal effect by asking us to apply section 1.162-7(b)(2), Income Tax Regs., to a portion of the 2016 amount.[27] This regulation provides that if contingent compensation is paid under a free bargain between an employer and employee before the services are rendered, then

---

[27] This argument originally formed a part of petitioner's motion for partial summary judgment filed October 14, 2020, which we denied on February 4, 2021, on grounds that the issue was not factually ripe for decision at that time.  We accordingly revisit this issue following trial.

[*49] the purported compensation amount should be allowed as a deduction even though it may be greater than what may ordinarily be paid.

There is little to no evidence that a bargain as envisioned under this regulation existed between petitioner and Mr. Hood with respect to any portion of the 2016 amount. No written management services agreement outlining an understanding between petitioner and Mr. Hood was put into place regarding his potential total compensation for that year. Neither did petitioner establish that its board of directors considered any part of the 2016 amount at the May 2015 meeting, i.e., before the commencement of Mr. Hood's 2016 performance.

### 9. Mr. Hood's Prior Compensation

Where a large salary increase is in issue (as in the case at hand), it may be useful to compare past and present duties and salary payments, Elliotts, Inc. v. Commissioner, 716 F.2d at 1245, to determine whether and to what extent the current payments represent compensation for services performed in prior years that can be currently deductible, Lucas v. Ox Fibre Brush Co., 281 U.S. at 119-120.

Mr. Hood's total purported compensation increased over 300% in petitioner's 2015 tax year, its most profitable year to date, yet there was no corresponding increase in Mr. Hood's duties or responsibilities in that year. See Miles-Conley Co. v. Commissioner, 173 F.2d 958, 960 (4th Cir. 1949) (finding

[*50] that where a taxpayer's sole stockholder had been paid much less for his service in the same position in previous years, and his compensation increased dramatically when the corporation's profits increased, an inference is warranted that the taxpayer's sole stockholder was attempting to drain off the corporate profits in the guise of salary), aff'g 10 T.C. 754 (1948). The stated justification per the corporate minutes for this increase is that Mr. Hood was undercompensated in prior years. While we do not disagree that Mr. Hood was undercompensated in certain years of the review period, this does not entitle petitioner to carte blanche in deducting Mr. Hood's backpay bonus amount, see Owensby & Kritikos, Inc. v. Commissioner, 819 F.2d at 1325 ("[L]imits to reasonable compensation exist even for the most valuable employees."), and we view board minutes statements like these with a certain degree of skepticism, see United States v. Smith, 418 F.2d 589, 593-594 (5th Cir. 1969). Moreover, petitioner did not sufficiently demonstrate through reliable means how the full amount of each of the 2015 and 2016 amounts was proportionate in value to each of the purported past services rendered by Mr. Hood. See Botany Worsted Mills v. United States, 278 U.S 282, 293 (1929); Estate of Wallace v. Commissioner, 95 T.C. at 553-554; Woesner Abstract & Title Co. v. Commissioner, T.C. Memo. 1983-764.

[*51]    10.    <u>Mr. Hood's Personal Guaranty of Petitioner's Debts and Bonding Obligations</u>

Petitioner's justification for Mr. Hood's higher compensation for the years at issue includes Mr. Hood's debt guaranties and surety bond guaranties during the review period.  Guaranty fees may qualify as a deductible business expense under section 162(a).  <u>See</u> <u>R.J. Nicoll Co. v. Commissioner</u>, 59 T.C. at 51-52; <u>A.A. & E.B. Jones Co. v. Commissioner</u>, T.C. Memo. 1960-284.  This Court has taken into account some of the following considerations when deciding the deductibility of such fees paid to a shareholder-employee:  (1) whether the fees were reasonable in amount given the financial risks; (2) whether businesses of the same type and size as the payor customarily pay such fees to shareholders; (3) whether the shareholder-employee demanded compensation for the guaranty; (4) whether the payor had sufficient profits to pay a dividend but failed to do so; and (5) whether the purported guaranty fees were proportional to stock ownership.  <u>E.J. Harrison & Sons, Inc. v. Commissioner</u>, 2003 WL 21921049, at *14; <u>Fong v. Commissioner</u>, T.C. Memo. 1984-402, <u>aff'd without published opinion</u>, 816 F.2d 684 (9th Cir. 1987).

The record shows that it is customary for the owners of construction companies to guarantee debts and bonds, and that compensation for these guaranties is appropriate.  Further, respondent's expert witness, Mr. Fuller, found

[*52] that the compensation petitioner paid to Mr. Hood in the years at issue for his surety bond guaranties was reasonable.[28] We recognize that Mr. Hood historically did not seek compensation for the guaranties and petitioner had sufficient profits to pay a dividend during the years at issue; however, we place more weight on the customary nature and reasonableness of the fees.

### 11. Conclusion

When we consider the totality of the factors discussed above, we conclude that petitioner has not adequately established how the amounts paid to Mr. Hood during the years at issue were both reasonable and paid solely as compensation for his services to petitioner during the review period. While certain factors favor petitioner, we do not simply sum which party had the most factors in reaching our conclusion as not all factors are afforded equal weight. See Medina v. Commissioner, T.C. Memo. 1983-253. Here, the factors addressing comparable pay by comparable concerns, petitioner's shareholder distribution history, the setting of Mr. Hood's compensation in the years at issue, and Mr. Hood's

---

[28] Mr. Fuller distinguishes the surety bond guaranties from the debt guaranties. He concluded that no compensation should have been issued with respect to the debt guaranties because petitioner also lent money and extended credit to Mr. Hood and his other businesses during the years at issue.

[*53] involvement in petitioner's business were the most relevant and persuasive factors in reaching our conclusion.

In determining the appropriate dollar amount, we found Mr. Fuller's testimony most helpful. He considered the multifactor approach, included compensation for the surety bond guaranties,[29] and offered a well-reasoned comparison of petitioner and Mr. Hood's salary against industry standards. Accordingly, we hold that the record supports reasonable compensation of $3,681,269 for tax year 2015 and $1,362,831 for tax year 2016.

III.    Penalties

A.    Section 6662 in General

A 20% penalty applies to any portion of an underpayment of tax required to be shown on a return which is attributable to a substantial understatement of income tax (substantial understatement penalty). Sec. 6662(a), (b)(2). For a subchapter C corporation such as petitioner, a substantial understatement of income tax is an understatement that exceeds the lesser of 10% of the tax required

---

[29] We accept the primary opinion rather than the alternative opinion because, as Mr. Fuller noted, the PAS survey does not explicitly state that the compensation for a board chairman included the compensation of surety bond guaranties. As explained under section III of the Fuller report, such compensation should be considered reasonable.

[*54] to be shown on the return for the taxable year (or, if greater, $10,000) or $10,000,000. Sec. 6662(d)(1)(B). The Commissioner has no burden of production with respect to the penalty where (as here) the taxpayer is a corporation. NT, Inc. v. Commissioner, 126 T.C. 191, 195 (2006) (noting that by its terms section 7491(c), which places the burden of production with respect to penalties on the Commissioner, does not apply to corporations, only "individual[s]"). The understatements for the years at issue qualify as "substantial" within the meaning of section 6662(d)(1)(B) because each exceeds 10% of the tax required to be shown on the return for the tax year.

B.    Reasonable Cause and Good Faith

The substantial understatement penalty does not apply with respect to any portion of an underpayment as to which the taxpayer acted with reasonable cause and in good faith. Sec. 6664(c)(1). Whether a taxpayer acted with reasonable cause and in good faith is decided on a case-by-case basis, taking into account all pertinent facts and circumstances. Sec. 1.6664-4(b)(1), Income Tax Regs. Reasonable cause requires that the taxpayer exercised ordinary business care and prudence as to the disputed item. See Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 98 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002). A

**[\*55]** taxpayer's reliance on professional advice may sometimes meet this standard.  See id.

For a taxpayer to reasonably rely upon professional advice to negate a substantial understatement penalty, the taxpayer must prove by a preponderance of the evidence that:  (1) the adviser was a competent professional who had sufficient expertise to justify reliance; (2) the taxpayer provided necessary and accurate information to the adviser; and (3) the taxpayer actually relied in good faith on the adviser's judgment.  Id. at 99; see also Higbee v. Commissioner, 116 T.C. 438, 446-447 (2001) (holding that, in a situation such as here, the taxpayer bears the burden of proof with regard to issues of reasonable cause); sec. 1.6664-4(c)(1), Income Tax Regs. (providing additional rules for reliance on the advice of others).  In cases involving corporations, we look at the efforts of a corporate taxpayer's relevant decision makers, officers, and employees to ascertain the corporation's proper tax liability in determining whether the taxpayer meets this standard.  See, e.g., Gerdau Macsteel, Inc. v. Commissioner, 139 T.C. 67, 194 (2012); Makric Enters., Inc. v. Commissioner, T.C. Memo. 2016-44, at \*67-\*68, aff'd per curiam, 683 F. App'x 282 (5th Cir. 2017); Goyak v. Commissioner, T.C. Memo. 2012-13, 2012 WL 86603, at \*16.

**[\*56]**       1.       <u>2015 Amount</u>

                   a.       <u>Competent Professional With Sufficient Expertise</u>

Petitioner sought advice on the amount of Mr. Hood's potential compensation and the applicable tax consequences from Mr. Greenway and Mr. Stokes, its external CPAs at the accounting firm Elliott Davis. Mr. Greenway was an audit partner at Elliott Davis for nearly 18 years with more than 30 years' experience as a CPA. As head of Elliott Davis' construction practice group, he had a history of working with petitioner before the years at issue and was familiar with the comparative performance and profitability of petitioner against its industry peers through his "hundreds of [other] construction clients". Mr. Greenway testified that he considered at least two construction industry compensation external surveys in connection with the advice he provided to petitioner regarding Mr. Hood's compensation. As a tax partner at Elliott Davis with almost 20 years of experience as a CPA, Mr. Stokes was similarly qualified. His relevant experience included guiding at least 20 other clients on executive compensation matters and acting as a personal tax adviser to both petitioner and Mr. Hood. Petitioner's advisers were therefore adequately positioned to counsel petitioner on the issue of Mr. Hood's compensation and its tax implications.

**[*57]**         b.         Taxpayer Provided Necessary and Accurate Information

Mr. Phillips initially raised the issue of Mr. Hood's historic compensation with Mr. Greenway in fall 2014. Over the course of the next several months, Mr. Phillips performed preliminary computations in an Excel spreadsheet. Mr. Phillips provided draft computations to Mr. Greenway and Mr. Stokes during the May 2015 meeting, and all agreed in that meeting that Mr. Hood deserved backpay compensation in a $5 million bonus pending followup research and analysis.

As part of the followup due diligence, Mr. Phillips finalized his computations as the compensation due spreadsheet. The spreadsheet set forth certain financial information concerning petitioner for each year of the review period through May 31, 2015, Mr. Hood's annual reported compensation for each of those years,[30] and a series of items for each year labeled "Clary Hood Calculated Compensation". Although respondent disagrees with the assumptions underlying the "Clary Hood Calculated Compensation" items, neither adviser indicated that the data and analyses provided by Mr. Phillips were incorrect or inadequate for

---

[30] Respondent does not challenge the accuracy of petitioner's historical financial information or Mr. Hood's reported compensation for petitioner's tax years ending May 31, 2000 to 2014.

[*58] purposes of their review; and respondent does not point to any other information that petitioner should have provided to Mr. Stokes or Mr. Greenway.

   c.  <u>Taxpayer Actually Relied on the Adviser's Judgment</u>

Mr. and Mrs. Hood, as the sole members of petitioner's board of directors and ultimate decisionmakers as to the setting of Mr. Hood's compensation, had limited financial and accounting knowledge and trusted Mr. Phillips, a CPA, to guide them as to the issue of Mr. Hood's compensation for the years at issue. Mr. Phillips, as petitioner's CFO and signer of its Federal income tax returns, knew petitioner's financial performance and Federal tax profile better than anyone at the company but was similarly inexperienced in matters of executive compensation. Recognizing these shortcomings and wanting to ensure petitioner arrived at a reasonable amount of compensation for Mr. Hood, Mr. Phillips went to petitioner's CPAs at Elliott Davis for advice beginning in 2014 and continued to discuss the issue of Mr. Hood's compensation with petitioner's advisers throughout May 2015.

Following the May 2015 meeting, Mr. Stokes provided Mr. Phillips with research material summarizing the tax law on executive compensation. Mr. Stokes also reviewed the compensation due spreadsheet that Mr. Phillips had created for the purpose of analyzing a potential bonus amount for Mr. Hood for the 2015 tax year. The spreadsheet was based on petitioner's facts and incorporated input Mr.

[*59] Phillips previously received from Mr. Greenway. Although Mr. Stokes testified that he did not scrutinize each component underlying the comprehensive spreadsheet, his existing knowledge of petitioner's business did not lead him to believe that any of these assumptions were unreasonable, with Mr. Greenway confirming the same at trial. Mr. Stokes made a few modifications to the compensation due spreadsheet before sending it back to Mr. Phillips (with a carbon copy to Mr. Hood). In his email Mr. Stokes noted his approval of the analysis in the spreadsheet and its helpfulness in documenting the support necessary for the proposed 2015 amount.

We are satisfied that petitioner relied in good faith on the above advice when awarding Mr. Hood the 2015 amount and deducting the same for its 2015 tax year.[31] The record does not show evidence of a rubber-stamp approval or a wink-and-a-smile by its advisers with respect to the 2015 amount. Cf. Exelon Corp. v. Commissioner, 147 T.C. 230, 332-336 (2016), aff'd, 906 F.3d 513 (5th Cir. 2018).

---

[31] We do not find relevant the fact that petitioner's external advisers did not issue a formal written opinion. See sec. 1.6664-4(c)(2), Income Tax Regs. (providing that "[a]dvice does not have to be in any particular form" for purposes of the reasonable cause and good faith exception); see also Woodsum v. Commissioner, 136 T.C. 585, 593 (2011) (holding that, to constitute "advice" within the meaning of sec. 1.6664-4(c)(2), Income Tax Regs., a communication must simply reflect the adviser's "analysis or conclusion").

[*60] Similarly, respondent does not question the independence of the advisers, whom we find to be credible individuals with no inherent conflict of interest or demonstrated history of promoting tax-abusive behavior. Cf. Neonatology Assocs., P.A. v. Commissioner, 115 T.C. at 98-99. Moreover, petitioner's reliance on its longtime advisers was reasonable considering its lack of experience in dealing with the complicated issue of executive compensation, even if that advice was ultimately incorrect. See United States v. Boyle, 469 U.S. 241, 251 (1985) (noting that due care generally does not require a taxpayer to "challenge" an adviser or "seek a second opinion"); Bruce v. Commissioner, T.C. Memo. 2014-178, at *56 (concluding taxpayer's reliance on qualified and nonconflicted longtime adviser reasonable despite incorrect advice), aff'd, 608 F. App'x 268 (5th Cir. 2015); Longoria v. Commissioner, T.C. Memo. 2009-162, 2009 WL 1905040, at *11 (holding reasonable taxpayer's reliance on advice from a CPA even where the CPA "acted unreasonably in dispensing it"). Accordingly, we decline to sustain respondent's determination as to the accuracy-related penalty for the 2015 amount.

2.    2016 Amount

Petitioner contends that it also reasonably relied on professional advice in awarding Mr. Hood the 2016 amount. In contrast to the detailed record

[*61] surrounding the advice given to determine the 2015 amount, petitioner provided almost no evidence with respect to the advice it may have received to determine the 2016 amount. Mr. Phillips prepared an updated compensation due spreadsheet for the 2016 amount; however, there is no evidence that petitioner's board of directors considered or relied on his worksheet when deciding to award Mr. Hood the 2016 amount. Mr. Phillips and Mr. Stokes each testified that an analysis similar to the one performed for the 2015 amount was undertaken in 2016, but there is no evidence in the record of any communication between petitioner and its advisers that would credibly support a finding that advice was actually rendered with respect to the 2016 amount. This absence becomes even more critical when considering that (1) in awarding Mr. Hood the 2015 amount, the record does not reflect that petitioner still believed Mr. Hood remained entitled to additional backpay compensation for the review period and (2) in awarding Mr. Hood the 2016 amount, the board minutes did not attempt to address why it felt the 2015 amount had been insufficient in this regard. If this changing view was based on advice petitioner received during its 2016 tax year, we would need to know what that specific advice was and who provided it. Without such facts we cannot properly apply the Neonatology Assocs., P.A. factors to determine whether any

**[*62]** such advice was reasonable and followed by petitioner in good faith as to the 2016 amount. See Higbee v. Commissioner, 116 T.C. at 446-447.

C.    Substantial Authority

Petitioner alternatively argues that it has substantial authority to negate the imposition of the substantial understatement penalty with respect to the 2016 amount. Section 6662(d)(2)(B)(i) reduces an understatement for purposes of the substantial understatement penalty by a portion of the understatement that is attributable to the tax treatment of any item for which there is (or was) substantial authority for such treatment. We have stated that a challenged position has "substantial authority" when there is around a 40% chance of success on the merits. See Canal Corp. & Subs. v. Commissioner, 135 T.C. 199, 219 n.15 (2010); sec. 1.6662-4(d)(2), Income Tax Regs. (substantial authority standard is less stringent than the more-likely-than-not standard, i.e., where there is a greater than 50% likelihood of the position being upheld, but more stringent than the reasonable basis standard, i.e., significantly higher than "not frivolous or not patently improper" and not "merely arguable"). The substantial authority standard is objective, and therefore it is not relevant whether the taxpayer believed substantial authority existed. Sec. 1.6662-4(d)(3)(i), Income Tax Regs.

[*63] Petitioner alleges its return position for each year at issue, including the 2016 amount, was premised on the independent investor test and asserts that two decisions by the U.S. Court of Appeals for the Seventh Circuit, Menard, Inc. v. Commissioner, 560 F.3d 620 (7th Cir. 2009), rev'g T.C. Memo. 2004-207, and Exacto Spring Corp. v. Commissioner, 196 F.3d 833, "provide clear cut substantial authority" for petitioner's use of this test for the years at issue.  Section 1.6662-4(d)(3)(iv)(B), Income Tax Regs., permits taxpayers to consider court cases outside the taxpayer's home jurisdiction to establish substantial authority; however, a single Court of Appeals' adoption of a test does not necessarily equate to substantial authority.  While other Courts of Appeals have considered the independent investor test as a part of the multifactor approach, e.g., Metro Leasing & Dev. Corp. v. Commissioner, 376 F.3d at 1019; Alpha Medical, Inc. v. Commissioner, 172 F.3d at 946, 949; Dexsil Corp. v. Commissioner, 147 F.3d at 100-101; Owensby & Kritikos, Inc. v. Commissioner, 819 F.2d at 1323, only the Court of Appeals for the Seventh Circuit supports petitioner's position, i.e., that it may rely exclusively on the independent investor test in determining reasonable compensation, see Eberl's Claim Serv., Inc. v. Commissioner, 249 F.3d 994, 1004 n.6 (10th Cir. 2001) ("[O]nly the Seventh [Circuit Court of Appeals] has gone so far as to jettison the multi-factor approach entirely."), aff'g T.C. Memo. 1999-211.

**[*64]** Moreover, the Court of Appeals for the Fourth Circuit, the court to which an appeal of this case would lie, see sec. 7482(b), applies the multifactor approach without consideration of a hypothetical investor and without indication that a different formulation of this test might be more appropriate, see Richlands Med. Ass'n v. Commissioner, 1992 WL 14603; see also Golsen v. Commissioner, 54 T.C. 742. We therefore cannot accept that petitioner's position with respect to the 2016 amount was based on substantial authority.[32]

To reflect the foregoing,

Decision will be entered under

Rule 155.

---

[32] Even if petitioner had substantial authority for use of the independent investor test, we are still unpersuaded that substantial authority existed for petitioner's position after applying this test to its facts, i.e., petitioner did not sufficiently establish (particularly through its expert witnesses) that an independent investor would have found as reasonable the $5 million paid to Mr. Hood in 2016.